**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| IN RE: JEFFREY B. CLARK,<br><br>   **Appellant**<br><br>**v.**<br><br>**D.C. OFFICE OF DISCIPLINARY COUNSEL,**<br><br>   **Appellee** | **Nos. 23-7073, 23-7074, and 23-7075 (consolidated)** |

## MOTION TO STAY IN LIGHT OF NEW DEVELOPMENTS CONCERNING THE APPLICATION OF *COINBASE*

Pursuant to Federal Rule of Appellate Procedure 8(a)(2), Appellant Jeffrey Clark hereby submits this Motion to Stay in Light of New Developments Concerning the Application of *Coinbase* ("Motion"). The two new developments that cause us to move again for a stay pending appeal are attached as Exhibits 1 and 2.

On October 26, 2023, this Court denied two stay requests made by Mr. Clark. The Court included one sentence in its order concerning the prior stay requests that is relevant to this new Motion: "Nor has appellant shown that the district court's June 8, 2023, remand order has been automatically stayed pending appeal." Order, Document # 2023887 at 2 (Oct. 26, 2023). That had the effect of rejecting Mr. Clark's argument from *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) (which in turn traces back to *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56 (1982)). No

1

reasoning was provided to support the Court's conclusion.

Since late October 2023, however, two important developments have occurred that we believe bear out our *Coinbase* and *Griggs* arguments. Those events both relate to developments in the *United States v. Trump* litigation pending in the U.S. District Court for the District of Columbia (Case Number 1:23-cr-00257-TSC) and which is now before this Court in the interlocutory appeal (Case Number 23-3228).

In particular, the two developments both relate directly to the automatic stay that *Coinbase* (drawing on *Griggs*) commands pending appeal when the underlying appeal relates to where or whether a trial should be held:

*First*, President Trump's motion for a stay pending appeal concerning whether he is presidentially immune from the federal criminal case against him in the U.S. District Court for the District of Columbia has been granted by Judge Chutkan. *See* Exhibit 1.

*Second*, Special Counsel Smith has filed a petition for certiorari before judgment in the U.S. Supreme Court in No. 23-624 to skip over adjudication of President Trump's appeal in this Court on the immunity defense and instead have the immunity dispute be resolved on an expedited basis directly by the U.S. Supreme Court. *See* Exhibit 2.

These two developments warrant this Court taking a fresh look at Mr. Clark's arguments for an automatic stay based on equal application of *Coinbase*/*Griggs* or

at least setting out reasons in writing as to why a *Coinbase*/*Griggs* stay should not be entered here as it was by Judge Chutkan in *United States v. Trump*:

1.  Judge Chutkan rightly granted a stay pending appeal based on the Supreme Court's decisions in *Griggs*, 459 U.S. at 58; and *Coinbase*, 599 U.S. at 739–44. As the Court is aware, *Coinbase* was one of the main grounds for Mr. Clark's argument that he is entitled to an automatic stay of any proceedings against him in this matter pending resolution of this appeal on the issue of removal jurisdiction. Judge Chutkan granted a stay on this same rationale: "The [*Coinbase*] Court reasoned that because 'whether the litigation may go forward in the district court is precisely what the court of appeals must decide[,] . . . it makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one.' *Id.* at 741 (quotations omitted)." Ex. 1 at 1. "We conclude that, after Coinbase appealed from the denial of its motion to compel arbitration***, the District Court was required to stay its proceedings***." *Coinbase*, 143 S. Ct. at 1923 (emphasis added).

The same logic applies here. The issue in Mr. Clark's appeal is precisely "whether the litigation may go forward in the district court" (depending here on whether the case was properly removed or not). This is conceptually the same issue for purposes of obtaining an automatic stay as in *Coinbase* where there was a dispute

about whether a matter should be resolved via an arbitration process or in federal district court. In short, as in *Coinbase*, "it makes no sense for trial to go forward [in Hearing Committee #12] while the court of appeals cogitates on whether there should be one [in federal district court instead]." Ex. 1 at 1 (citing *Coinbase*).

2. The petition for certiorari before judgment filed by Special Counsel Smith similarly acknowledges the applicability of *Coinbase* and *Griggs* to President Trump's appeal of the denial of his motion to dismiss on presidential immunity grounds. President Trump also sought a stay pending appeal based on the *Griggs* principle (which is the main Supreme Court case on which *Coinbase* builds). According to Special Counsel Smith: "The district court presiding over this case rejected respondent's constitutional arguments and has scheduled trial for March 4, 2024. Respondent's notice of appeal, however, suspends trial proceedings, see *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam), and respondent has moved for a stay of all proceedings in the district court while his appeal is pending, see D. Ct. Doc. 178 (Dec. 7, 2023)."

Hence, the official position of the U.S. Justice Department is that when appeals concern "whether the litigation may go forward in the district court," *Coinbase*, 599 U.S. at 741, an automatic stay applies. There is no reason why Mr.

Clark should not be entitled to the benefit here of *Griggs*, *Coinbase*, and application of the correct U.S. Justice Department reading of those cases as applied in stay-pending-appeal matters. Nothing in *Griggs* or *Coinbase* limits the doctrine to situations involving the President as a litigant while denying it to Mr. Clark—a former high-ranking Justice Department official.

**Third**, there are no other grounds on which to deny *Coinbase* automatic-stay relief here. The D.C. Office of Disciplinary Counsel's ("ODC") argued that *Coinbase* only applies to arbitration disputes (i.e., where the fight is over whether a case would be resolved by an arbitrator or instead via a trial in federal district court). *See* Exhibit 3 (Disciplinary Counsel's Response to Clark's Emergency Supplement, filed in *In re Clark*, No. 22-BG-891, at 3-4 (Oct. 13, 2023). This argument must be rejected. Exhibits 1 and 2, as drawn from President Trump's defense of himself in the Special Counsel's prosecution of him in the court below, readily prove this point. As Judge Chutkan recognized: "[T]he [*Coinbase*] Court analogized its holding to similar decisions in the context of appeals ***involving immunity and <u>double jeopardy</u>***." (Emphasis added). Ex. 1 at 1. *See also Coinbase*, 599 U.S. at 742 & n.4 ("In the Circuits that have considered the issue ***in the analogous contexts of qualified immunity <u>and double jeopardy</u>***, moreover, district courts likewise must automatically stay their proceedings while the interlocutory appeal is ongoing." (Emphasis added). In this way, Judge Chutkan readily saw that there is no blanket

rule that *Coinbase* does not apply in the criminal setting.[1] Her analysis is correct and should be adopted by this Court.

Moreover, *Coinbase* sets out a general principle that becomes inapplicable ***only when it is turned off by an explicit statutory non-stay rule concerning appeals***:

> At least absent contrary indications, the background *Griggs* principle already requires an automatic stay of district court proceedings that relate to any aspect of the case involved in the appeal. By contrast, when Congress wants to authorize an interlocutory appeal, but not to automatically stay district court proceedings pending that appeal, Congress typically says so. Since the creation of the modern courts of appeals system in 1891, Congress has enacted multiple statutory "non-stay" provisions.

*Coinbase*, 599 U.S. at 744 (collecting cases in footnote 6). And what is most notable is that all of the non-stay rule cases collected in that footnote involve a statute which ***explicitly*** turn off stays pending appeal. Consider just a few examples cited in *Coinbase* footnote 6:

> **(1) Federal Rule of Civil Procedure 23(f),** no automatic stay pending appeal of denials of class certification;

> **(2) The Judiciary Act of 1891,** § 7, 26 Stat. 828; Act of June 6, 1900, ch. 803, 31 Stat. 660–661 provides "the proceedings in other respects in the court below shall not be stayed, unless ordered by that court, or by the appellate court or a judge therefore, during the pendency of such appeal ….";

> **(3) Federal Courts Improvement Act of 1982,** 28 U.S.C. § 1292(d)(3) (no automatic stay of proceedings in the Court of International Trade or

---

[1] And, as the Court is aware from our prior briefing, the D.C. Court of Appeals has held that bar discipline cases are quasi-criminal in nature, see *In re Artis*, 883 A.2d 85, 98 (D.C. 2005).

in the Court of Federal Claims, pending appeal); and

**(4) Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,** 28 U.S.C. § 158(d)(2)(D) (no automatic stay pending appeal.).

All of these provisions are designed to specifically and explicitly turn off the *Griggs/Coinbase* rule. By contrast, no such explicit non-stay rule exists in any relevant removal statute governing this case.[2] For this reason, the default principles of *Griggs* and *Coinbase* fully apply.

***Fourth***, we acknowledge that Judge Chutkan did rule that she was not entirely divested of jurisdiction. She was particularly keen on arguing that she could maintain the "gag order" (as modified by this Court) that she had imposed on President Trump as well as other pretrial restrictions she thought important:

> [T]he court does not understand the required stay of further proceedings to divest it of jurisdiction to enforce the measures it has already imposed to safeguard the integrity of these proceedings, including: Defendant's conditions of release, ECF No. 13; the protective orders governing discovery materials, ECF No. 28, 37; the restrictions on extrajudicial statements, ECF No. 105, as modified by the D.C. Circuit's decision in *United States v. Trump*, No. 23-3190, 2023 WL 8517991, at *28 (D.C. Cir. Dec. 8, 2023); and protective jury procedures, ECF No.130.

Ex. 1 at 2.

We do not agree with Judge Chutkan's attempt to limit the scope of *Coinbase*, but nothing turns on this as to Mr. Clark's case, since she recognized that she would

---

[2] ODC has certainly never pointed to one.

have to stay "requiring additional discovery or briefing," as those sorts of deadlines "advance the case towards trial or impose burdens of litigation on Defendant beyond those he already carries." *Id.* at 3. And it is precisely those sorts of deadlines that we seek to have frozen here as they would otherwise be established in the Hearing Committee #12 hearing process in the local D.C. disciplinary forum. Indeed, in this case, Mr. Clark is not subject to any protective orders in Hearing Committee #12 or any restrictions on making statements outside of Hearing Committee #12's trial-like process that are analogous to what Judge Chutkan sought to carve out of the automatic *Coinbase* stay as applied to *United States v. Trump*.

We believe this Court should revisit the issue of the *Coinbase/Griggs* automatic stay that we sought for Mr. Clark and order that until this appeal is resolved (and indeed through the time that the Supreme Court resolves any further judicial review or denies certiorari, if that becomes necessary), Hearing Committee #12, the D.C. Board of Professional Responsibility, and the D.C. Court of Appeals should not be "advanc[ing] the case towards trial or impos[ing] burdens of litigation on Defendant …." Ex. 2 at 3.

## CONCLUSION

This Motion to Stay in Light of New Developments Concerning the Application of Coinbase should be granted. This Court should recognize the applicability of *Coinbase* and acknowledge ***in a written order*** the need to enter an

automatic stay pending appeal as soon as possible. It should neither refer this Motion to the merits panel, nor should it deny application of *Coinbase* to this case without setting out the rationale for doing so in an order. To take steps of that nature would be **(1)** to deny Mr. Clark his right to be free of Hearing Committee #12 trial-like proceedings pending this appeal or **(2)** to frustrate his ability to seek en banc and/or Supreme Court review of the important matter of the intersection of *Griggs/Coinbase* with federal officer removals.

Respectfully submitted, this 14th day of December, 2023.

*/s/ Harry W. MacDougald*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME AND TYPEFACE LIMITATIONS

I HEREBY CERTIFY THAT that the foregoing **Motion to Stay in Light of New Developments Concerning the Application of *Coinbase*** complies with the type-volume limitations for motions. As determined by the Microsoft Word software used to produce this brief, it contains 1,984 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32(a)(1).

I further certify that this document is prepared using the Times New Roman font in the 14-point size.

Respectfully submitted, this 14th day of December, 2023.


/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076
*Counsel for Petitioners*
Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party

with a copy of this ***Motion to Stay in Light of New Developments Concerning the***

***Application of* Coinbase** via the ECF system:

Hamilton P. Fox
Jason R. Horrell
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 14tha day of December 2023

*/s/ Harry W. MacDougald*
Harry W. MacDougald
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**UNITED STATES OF AMERICA**,

v.

**DONALD J. TRUMP**,

        Defendant.

Criminal Action No. 23-257 (TSC)

---

### OPINION AND ORDER

On December 4, 2023, the court issued a Memorandum Opinion and Order denying Defendant's motions to dismiss based on Presidential immunity and constitutional grounds. ECF Nos. 171, 172. Defendant has appealed that decision, ECF No. 177, and filed a Motion to Stay Proceedings Pending Appeal, ECF No. 178 ("Motion"). For the reasons set forth below, the court will GRANT in part and DENY in part Defendant's Motion.

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). In *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 739–44 (2023), the Supreme Court applied the *Griggs* principle to an interlocutory appeal of the denial of a motion to compel arbitration, holding that any further proceedings before the district court must automatically be stayed. The Court reasoned that because "whether the litigation may go forward in the district court is precisely what the court of appeals must decide[,] . . . it makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one." *Id.* at 741 (quotations omitted). And the Court analogized its holding to similar decisions in the context of appeals involving immunity and double jeopardy. *Id.* at 742.

As the D.C. Circuit recently made clear, a former President's absolute immunity would constitute "an entitlement not to stand trial or face the other burdens of litigation," such as discovery obligations.  *Blassingame v. Trump*, No. 22-5069, 2023 WL 8291481, at *22 (D.C. Cir. Dec. 1, 2023) (citation omitted).  Thus, because Defendant has appealed this court's denial of that immunity, "whether the litigation may go forward in the district court is precisely what the court of appeals must decide."  *Coinbase*, 599 U.S. at 741 (quotation omitted). Consequently, the court agrees with both parties that Defendant's appeal automatically stays any further proceedings that would move this case towards trial or impose additional burdens of litigation on Defendant.  Motion at 1; Gvt.'s Opp'n to Def.'s Mot. to Stay Proceedings Pending Appeal at 3, ECF No. 182.  Accordingly, and for clarity, the court hereby STAYS the deadlines and proceedings scheduled by its Pretrial Order, as amended.  *See* ECF No. 39; *see also* Def.'s Reply in Supp. of Mot. to Stay Proceedings Pending Appeal at 3, ECF No. 185 ("Reply").

The court emphasizes two limits on that stay.  First, as Defendant notes, the stayed deadlines and proceedings are "held in abeyance," Motion at 1, rather than permanently vacated. If jurisdiction is returned to this court, it will—consistent with its duty to ensure both a speedy trial and fairness for all parties—consider at that time whether to retain or continue the dates of any still-future deadlines and proceedings, including the trial scheduled for March 4, 2024.

Second, the court does not understand the required stay of further proceedings to divest it of jurisdiction to enforce the measures it has already imposed to safeguard the integrity of these proceedings, including: Defendant's conditions of release, ECF No. 13; the protective orders governing discovery materials, ECF No. 28, 37; the restrictions on extrajudicial statements, ECF No. 105, as modified by the D.C. Circuit's decision in *United States v. Trump*, No. 23-3190, 2023 WL 8517991, at *28 (D.C. Cir. Dec. 8, 2023); and protective jury procedures, ECF No.

130.  Unlike, for example, requiring additional discovery or briefing, maintaining those measures does not advance the case towards trial or impose burdens of litigation on Defendant beyond those he already carries.  And if a criminal defendant could bypass those critical safeguards merely by asserting immunity and then appealing its denial, then during the appeal's pendency, the defendant could irreparably harm any future proceedings and their participants.

That said, there is little precedent guiding the application of *Griggs* to such protective measures.  The Ninth Circuit, at least, has transferred a "motion to enforce" a "protective order" back to the district court, even though the Circuit had taken "jurisdiction over the merits of the decision below, including the judgment," reasoning that "the district court has not been divested of its jurisdiction over ancillary matters, such as protective orders."  *Perry v. City & Cnty. of S.F.*, No. 10-16696, 2011 WL 2419868, at *1 (9th Cir. Apr. 27, 2011) (citing, among others, *Griggs*, 459 U.S. at 58).  But the parties have not identified—and the court is not aware of—any guiding precedent in this Circuit on that issue, much less instructive cases in the context of an interlocutory immunity appeal.  In addition, Defendant does not appear to argue that the protective measures are themselves stayed.  *See* Reply at 3.  Nonetheless, if he asks the court reviewing his immunity appeal to also take temporary jurisdiction over the enforcement of those measures, and that court agrees to do so, this court of course will be bound by that decision.


Date: December 13, 2023

*Tanya S. Chutkan*
_____
TANYA S. CHUTKAN
United States District Judge

# EXHIBIT 2

No.

# In the Supreme Court of the United States

---

UNITED STATES OF AMERICA, PETITIONER

*v.*

DONALD J. TRUMP

---

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

---

## PETITION FOR A WRIT OF CERTIORARI
## BEFORE JUDGMENT

---

JACK L. SMITH
  *Special Counsel*
J. P. COONEY
  *Deputy Special Counsel*
MICHAEL R. DREEBEN
  *Counselor to the
    Special Counsel
    Counsel of Record*
JAMES I. PEARCE
  *Assistant Special Counsel*

*Department of Justice
950 Pennsylvania Ave. NW
Room B-206
Washington, D.C. 20530-0001
SCO_JLS_SupremeCtBriefs
  @usdoj.gov
(202) 305-9654*

**QUESTION PRESENTED**

Whether a former President is absolutely immune from federal prosecution for crimes committed while in office or is constitutionally protected from federal prosecution when he has been impeached but not convicted before the criminal proceedings begin.

**RELATED PROCEEDINGS**

United States District Court (D.D.C.):

*United States* v. *Trump*, No. 23-cr-257 (Dec. 1, 2023)

United States Court of Appeals (D.C. Cir.):

*United States* v. *Trump*, No. 23-3190 (opinion issued Dec. 8, 2023)

*United States* v. *Trump*, No. 23-3228 (docketed Dec. 8, 2023)

## TABLE OF CONTENTS

Page

Opinion below.................................................................. 1
Jurisdiction..................................................................... 1
Constitutional provisions involved .............................. 2
Statement ....................................................................... 2
Reasons for granting the petition ................................ 8
   A.  This case warrants this Court's immediate review...... 10
   B.  The Court should order expedited briefing so that
      it can consider and decide this case promptly ............. 12
Conclusion ..................................................................... 14
Appendix A — District court memorandum opinion
             (Dec. 1, 2023).............................. 1a
Appendix B — Constitutional provisions ............................ 60a

## TABLE OF AUTHORITIES

Cases:

   *Biden* v. *Nebraska*, 600 U.S. 477 (2023) .............................. 12
   *DHS* v. *Regents of the Univ. of Cal.*,
      140 S. Ct. 1891 (2020) ....................................... 13
   *Dennis* v. *Sparks*, 449 U.S. 24 (1980).................................... 8
   *Department of Commerce* v. *New York*,
      139 S. Ct. 2551 (2019) ....................................... 12
   *Department of Educ.* v. *Brown*,
      600 U.S. 551 (2023)............................................ 12
   *Griggs* v. *Provident Consumer Disc. Co.*,
      459 U.S. 56 (1982) ............................................... 9
   *Nixon* v. *Fitzgerald*, 457 U.S. 731 (1982) ........................ 7, 9
   *Strunk* v. *United States*, 412 U.S. 434 (1973) ................... 11
   *Trump* v. *Hawaii*, 583 U.S. 1009 (2017)............................. 14
   *Trump* v. *Vance*, 140 S. Ct. 2412 (2020) .............................. 7

Cases—Continued:                                    Page

    *United States* v. *Hsia*,
      176 F.3d 517 (D.C. Cir. 1999), cert. denied,
      528 U.S. 1136 (2000)............................................................ 5

    *United States* v. *Nixon*, 418 U.S. 683 (1974)............ 3, 11, 12

    *United States* v. *Texas*, 599 U.S. 670 (2023) ...................... 12

    *United States* v. *Wampler*,
      624 F.3d 1330 (10th Cir. 2010), cert. denied,
      564 U.S. 1021 (2011)............................................................ 5

    *Whole Woman's Health* v. *Jackson*,
      595 U.S. 30 (2021) ............................................................ 12

Constitution, statutes, regulations, and rules:

    U.S. Const.:
      Art. I, § 3, Cl. 7
        (Impeachment Judgment Clause) ............. 4-6, 8, 60a
      Art. II, § 4 ...................................................................... 7
      Amend. I ........................................................................ 5
      Amend. V (Due Process Clause)............................ 5, 60a
    18 U.S.C. 241 ...................................................................... 4
    18 U.S.C. 371 ...................................................................... 3
    18 U.S.C. 1512(c)(2) ............................................................ 4
    28 U.S.C. 518(a) .................................................................. 1
    28 U.S.C. 1254(1) .............................................................. 10
    28 U.S.C. 2101(e) .............................................................. 10
    28 C.F.R.:
      Section 600.4(a).............................................................. 1
      Section 600.7(a).............................................................. 1
    Sup. Ct. R.:
      Rule 10(c) ...................................................................... 12
      Rule 11 .......................................................................... 10

V

Miscellaneous:                                    Page

    Dep't of Justice Order No. 5559-2022
      (Nov. 18, 2022)..................................................................... 1

# In the Supreme Court of the United States

No.

UNITED STATES OF AMERICA, PETITIONER

*v.*

DONALD J. TRUMP

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES COURT
OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

## PETITION FOR A WRIT OF CERTIORARI
## BEFORE JUDGMENT

The Special Counsel, on behalf of the United States, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the District of Columbia Circuit.[1]

### OPINION BELOW

The opinion and order of the district court (App., *infra*, 1a-59a) is not yet reported but is available at 2023 WL 8359833.

---

[1] Pursuant to 28 U.S.C. 518(a), and in accordance with 28 C.F.R. 600.4(a), 28 C.F.R. 600.7(a), and Department of Justice Order No. 5559-2022 (Nov. 18, 2022), the Special Counsel has been authorized to conduct litigation before this Court on behalf of the United States in this matter.

## JURISDICTION

The judgment of the district court was entered on December 1, 2023. Respondent filed a notice of appeal on December 7, 2023. The court of appeals' jurisdiction rests on 28 U.S.C. 1291. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 2101(e). See, *e.g.*, *Biden* v. *Nebraska*, 143 S. Ct. 477 (2022) (granting certiorari before judgment on a petition filed by a party that prevailed in district court); *United States* v. *Nixon*, 417 U.S. 927 (1974) (same).

## CONSTITUTIONAL PROVISIONS INVOLVED

Relevant constitutional provisions are reprinted at App., *infra*, 60a.

## STATEMENT

This case presents a fundamental question at the heart of our democracy: whether a former President is absolutely immune from federal prosecution for crimes committed while in office or is constitutionally protected from federal prosecution when he has been impeached but not convicted before the criminal proceedings begin. The district court rejected respondent's claims, correctly recognizing that former Presidents are not above the law and are accountable for their violations of federal criminal law while in office. App., *infra*, 7a-38a, 46a-53a. Respondent's appeal of the ruling rejecting his immunity and related claims, however, suspends the trial of the charges against him, scheduled to begin on March 4, 2024.

It is of imperative public importance that respondent's claims of immunity be resolved by this Court and that respondent's trial proceed as promptly as possible if his claim of immunity is rejected. Respondent's claims are profoundly mistaken, as the district court

held. But only this Court can definitively resolve them. The Court should grant a writ of certiorari before judgment to ensure that it can provide the expeditious resolution that this case warrants, just as it did in *United States* v. *Nixon*, 418 U.S. 683, 686-687 (1974).

1. Respondent served as the President of the United States from January 2017 until January 2021. The indictment alleges that respondent engaged in systematic and deliberate efforts to overturn the results of the 2020 presidential election and prevent the lawful transfer of power to his successor.

On August 1, 2023, a federal grand jury sitting in the District of Columbia charged respondent in a four-count indictment. D. Ct. Doc. 1. Count One, which charges a conspiracy to defraud the United States, in violation of 18 U.S.C. 371, alleges that respondent, then a candidate seeking re-election to the presidency, conspired with, among others, several individuals outside the Executive Branch to "overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified." D. Ct. Doc. 1 ¶¶ 1, 7, 8. The indictment further alleges that respondent aimed at accomplishing the conspiracy's objectives in five ways: using deceit toward state officials to subvert the legitimate election results in those States, *id.* ¶¶ 13-52; using deceit to organize fraudulent slates of electors in seven targeted States and cause them to send false certificates to Congress, *id.* ¶¶ 53-69; leveraging the Department of Justice to use deceit to have state officials replace the legitimate electoral slate with electors who would cast their votes for respondent, *id.* ¶¶ 70-85; attempting to enlist the Vice President to fraudulently alter the election results

during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* ¶¶ 86-105; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* ¶¶ 106-124. Counts Two and Three, which incorporate allegations from Count One, charge conspiracy and substantive violations of 18 U.S.C. 1512(c)(2) for corruptly obstructing the certification of the presidential election results on January 6, 2021. D. Ct. Doc. 1 ¶¶ 125-128. Count Four, which likewise incorporates the allegations from Count One, alleges that respondent conspired to violate one or more person's constitutional right to vote and have one's vote counted, in violation of 18 U.S.C. 241. D. Ct. Doc. 1 ¶¶ 129-130.

The district court scheduled the trial to begin on March 4, 2024, D. Ct. Doc. 38, at 55 (Aug. 28, 2023), with prospective jurors set to complete questionnaires on February 9, 2024, D. Ct. Doc. 130, at 1 (Nov. 2, 2023). Central to its selection of a March 4 trial date was the district court's recognition of the public's "right to a prompt and efficient resolution of this matter." D. Ct. Doc. 38, at 53.

2. Respondent moved to dismiss the indictment on the grounds, *inter alia*, that he enjoys absolute immunity from criminal prosecution for acts taken within the "outer perimeter" of his official responsibilities and that the indictment's allegations all fall within that scope; he also argued that double jeopardy principles and the Impeachment Judgment Clause, U.S. Const. Art. I, § 3, Cl. 7, barred his prosecution. See D. Ct. Doc. 74, at 8-45 (Oct. 5, 2023) (immunity); D. Ct. Doc. 113, at 18-24 (Oct. 23, 2023) (double jeopardy and Impeachment Judgment Clause). The government responded that a former

President has no such absolute immunity from federal criminal prosecution; that even if such immunity existed, it would be narrower than the "outer perimeter" standard that defines a President's immunity from civil liability; that even if that standard applied, the indictment should not be dismissed because it alleges conduct falling outside the outer perimeter of a President's official responsibilities; and that respondent's double-jeopardy argument lacks merit. D. Ct. Doc. No. 109, at 3-42 (Oct. 19, 2023) (immunity); D. Ct. Doc. No. 139, at 47-62 (Nov. 6, 2023) (double jeopardy).

The district court denied respondent's presidential-immunity claim and his related double-jeopardy claim.[2] App., *infra*, 7a-38a, 46a-53a. The court concluded that the Constitution's text, structure, and history support the conclusion that respondent "may be subject to federal investigation, indictment, prosecution, conviction, and punishment for any criminal acts undertaken while in office." *Id.* at 7a. Although the Constitution's text does not address presidential immunity, the court observed, that silence did not "reflect an understanding" that a former President possesses immunity from federal criminal prosecution for acts taken while in office. *Id.* at 10a. To the contrary, the court explained, the one constitutional provision that respondent invoked—the Impeachment Judgment Clause, U.S. Const. Art. I, § 3,

---

[2] The district court also denied respondent's motion to dismiss raising several other constitutional claims. App., *infra*, 38a-46a, 53a-58a. Respondent argued that the indictment should be dismissed under the First Amendment, *id.* at 38a-46a, and the Fifth Amendment's Due Process Clause, *id.* at 53a-58a. Those claims are not subject to interlocutory review. See *United States* v. *Hsia*, 176 F.3d 517, 526 (D.C. Cir. 1999), cert. denied, 528 U.S. 1136 (2000); *United States* v. *Wampler*, 624 F.3d 1330, 1334 (10th Cir. 2010), cert. denied, 564 U.S. 1021 (2011).

Cl. 7—cut against his immunity argument. App., *infra*, 10a-13a.

The Impeachment Judgment Clause provides:

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. Art. I, § 3, Cl. 7. The court noted that the Clause's first part "limits the penalties of impeachment to removal and disqualification from office," and the second part clarifies that "'the Party convicted'" may face "later criminal prosecution" but that any "'further punishment'" may not come from the legislature. App., *infra*, 11a-12a (citations omitted).

The district court reasoned that several features of the Impeachment Judgment Clause "undercut" respondent's assertion that it confers any immunity from criminal prosecution. App., *infra*, 12a. First, the term "'nevertheless'" clarified that the Clause's first part addressing the penalties that the legislature could impose following impeachment "does not bear on whether the Party would also be subject to criminal prosecution." *Ibid.* Second, materials written contemporaneously with the Constitution, such as those from Alexander Hamilton and James Wilson, did not reflect the view, let alone a "widespread consensus," as respondent contended, that the Impeachment Judgment Clause renders former Presidents immune unless they were impeached and convicted. *Id.* at 13a-14a. Third, respondent's interpretation of the Impeachment Judgment Clause relied on a negative implication—that a

President who is not convicted in an impeachment proceeding cannot face criminal prosecution—that reflected neither logic nor common sense. *Id.* at 14a-15a. Finally, respondent's interpretation would produce the untenable anomaly that a former President would be immune if he committed a crime that was not "Treason, Bribery, or other high Crimes and Misdemeanors," U.S. Const. Art. II, § 4, for which impeachment is not available, committed the crime near the end of his presidency, or covered up the crime during the time of his presidency. App., *infra*, 16a.

Turning from text to structure, the district court reasoned that the public interest in a former President's criminal prosecution outweighs the theoretical asserted burdens such a prosecution entails. App., *infra*, 17a-32a. Concerns about chilling presidential conduct were minimal, the court noted, because "whether to intentionally commit a federal crime" should not be among the "difficult decisions" a president faces. *Id.* at 22a. In addition, the court stated, the possibility of vexatious post-presidency litigation was "much reduced in the criminal context," *ibid.*, given "robust procedural safeguards attendant to federal criminal prosecutions" that protect former Presidents from harassment, *id.* at 24a. By contrast, "the public interest in fair and accurate judicial proceedings is at its height in the criminal setting." *Id.* at 25a (citing *Trump* v. *Vance*, 140 S. Ct. 2412, 2424 (2020)). Holding a former President criminally accountable, the district court observed, is "essential to fulfilling our constitutional promise of equal justice under the law," *id.* at 29a, and furthers "the public interest in an ongoing criminal prosecution," *id.* at 31a (quoting *Nixon* v. *Fitzgerald*, 457 U.S. 731, 753-754 (1982)).

The district court also found nothing in history to "justif[y] the absolute immunity" that respondent sought. App., *infra*, 32a. The court discerned "no evidence that the Founders understood the Constitution" to bestow such immunity, and the Executive Branch had "expressly and repeatedly concluded that a former President" was subject to criminal prosecution. *Ibid.* President Ford's pardon of former President Nixon aimed to "prevent" the latter's "potential criminal prosecution," demonstrating that respondent's view of presidential immunity from criminal liability "stands at odds with that of his predecessors in the Oval Office." *Id.* at 34a.

In addition, the district court noted that *Fitzgerald* had "analogized" a former President's immunity from civil liability "to the similar protections provided to judges and prosecutors." App., *infra*, 34a. The court explained that "notwithstanding their absolute civil immunity, prosecutors and judges are 'subject to criminal prosecutions as are other citizens.'" *Ibid.* (quoting *Dennis* v. *Sparks*, 449 U.S. 24, 31 (1980)).

In sum, the district court concluded that former Presidents "do not possess absolute federal criminal immunity for any acts committed while in office." App., *infra*, 37a. The court similarly rejected respondent's claim that his acquittal in impeachment proceedings afforded protection under double-jeopardy principles or the Impeachment Judgment Clause against his criminal prosecution after leaving office. *Id.* at 46a-53a.

## REASONS FOR GRANTING THE PETITION

A cornerstone of our constitutional order is that no person is above the law. The force of that principle is at its zenith where, as here, a grand jury has accused a former President of committing federal crimes to

subvert the peaceful transfer of power to his lawfully elected successor. Nothing could be more vital to our democracy than that a President who abuses the electoral system to remain in office is held accountable for criminal conduct. Yet respondent has asserted that the Constitution accords him absolute immunity from prosecution. The Constitution's text, structure, and history lend no support to that novel claim. This Court has accorded *civil* immunity for a President's actions within the outer perimeter of his official responsibilities, see *Nixon* v. *Fitzgerald*, 457 U.S. 731 (1982), and the Executive Branch has long held the view that a *sitting* President cannot be indicted while in office. But those principles cannot be extended to provide the absolute shield from criminal liability that respondent, a former President, asserts. Neither the separation of powers nor respondent's acquittal in impeachment proceedings lifts him above the reach of federal criminal law. Like other citizens, he is accountable for criminal conduct.

The district court presiding over this case rejected respondent's constitutional arguments and has scheduled trial for March 4, 2024. Respondent's notice of appeal, however, suspends trial proceedings, see *Griggs* v. *Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam), and respondent has moved for a stay of all proceedings in the district court while his appeal is pending, see D. Ct. Doc. 178 (Dec. 7, 2023). It is of paramount public importance that respondent's claims of immunity be resolved as expeditiously as possible—and, if respondent is not immune, that he receive a fair and speedy trial on these charges. The public, respondent, and the government are entitled to nothing less. Yet if this case proceeds through the ordinary—and even a highly expedited—appellate process, it is unclear

whether this Court would be able to hear and resolve the threshold immunity issues during its current Term. For that reason, the government seeks a writ of certiorari before judgment to afford this Court an opportunity to grant review now and ensure that it can timely resolve the important immunity question presented here.

The United States recognizes that this is an extraordinary request. This is an extraordinary case. The Court should grant certiorari and set a briefing schedule that would permit this case to be argued and resolved as promptly as possible.

### A. This Case Warrants This Court's Immediate Review

This case satisfies the standards for certiorari before judgment. The Court has jurisdiction to review "[c]ases in the courts of appeals * * * [b]y writ of certiorari * * * *before* or after rendition of judgment or decree." 28 U.S.C. 1254(1) (emphasis added). "An application * * * for a writ of certiorari to review a case before judgment has been rendered in the court of appeals may be made at any time before judgment." 28 U.S.C. 2101(e). A writ of certiorari before judgment is appropriate when "the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Sup. Ct. R. 11.

This case involves a paradigmatic issue of imperative public importance: the amenability to criminal prosecution of a former President of the United States for conduct undertaken during his presidency. It requires no extended discussion to confirm that this case—involving charges that respondent sought to thwart the peaceful transfer of power through violations of federal criminal law—is at the apex of public importance. The

charges implicate a central tenet of our democracy. And the charges allege that respondent conspired to transgress the law in manifold ways: by intentionally using fraudulent means to obstruct the presidential electoral process; by obstructing constitutionally prescribed processes in Congress for counting electoral votes; and by seeking to deprive millions of voters of their electoral choice for President.

The district court set this case for trial on March 4, 2024, to "ensure [fulfillment of] the public's interest in seeing this case resolved in a timely manner." D. Ct. Doc. 38, at 55. "The public interest in a broad sense, as well as the constitutional guarantee [of a speedy trial], commands prompt disposition of criminal charges." *Strunk* v. *United States*, 412 U.S. 434, 439 n.2 (1973). Vindicating that public interest in this case requires immediate resolution of the immunity question to permit the trial to occur on an appropriate timetable. If appellate review of the decision below were to proceed through the ordinary process in the court of appeals, the pace of review may not result in a final decision for many months; even if the decision arrives sooner, the timing of such a decision might prevent this Court from hearing and deciding the case this Term.

Precedent supports expeditious action. When the government sought certiorari before judgment in *United States v. Nixon*, 418 U.S. 683 (1974), a case presenting similarly consequential issues of presidential privilege, the Court granted the petition and resolved the constitutional question expeditiously so that trial could begin as scheduled. There, the district court overseeing one of the Watergate cases had scheduled trial to begin on September 9, 1974. On May 24, 1974, the Special Prosecutor sought certiorari before judgment

following the district court's denial of former President Nixon's motion to quash a subpoena seeking Oval Office recordings. *Id.* at 687-688, 690. The Court granted certiorari a week later and set the case for argument on July 8, 1974. *Id.* at 690. The decision issued 16 days later, and trial began in the fall of 1974.

This case warrants similar action. As in *Nixon*, "the public importance of the issues presented and the need for their prompt resolution" merit this Court's intervention now, without awaiting the completion of appellate proceedings. 418 U.S. at 687. And as in *Nixon*, that is true even though the district court correctly denied respondent's presidential-immunity and related double-jeopardy claims. While no precedent supports respondent's claim as a former President to *criminal* immunity, the government acknowledges that this Court has not addressed a comparable claim. And this is a quintessential example of "an important question of federal law that has not been, but should be, settled by this Court." Sup. Ct. R. 10(c).

In recent years, this Court has often granted certiorari before judgment in cases of imperative public importance that warranted an immediate determination by this Court. See, *e.g.*, *Department of Educ.* v. *Brown*, 600 U.S. 551, 556 (2023); *Biden* v. *Nebraska*, 600 U.S. 477, 489 (2023); *United States* v. *Texas*, 599 U.S. 670, 675 (2023); *Whole Woman's Health* v. *Jackson*, 595 U.S. 30, 35 (2021); *Department of Commerce* v. *New York*, 139 S. Ct. 2551, 2665 (2019). It should follow the same course here.

### B. The Court Should Order Expedited Briefing So That It Can Consider And Decide This Case Promptly

The government is filing this petition for a writ of certiorari before judgment not only because of the

public significance of the issues, but to ensure that the case may be briefed, argued, and decided during the ordinary decisional time for cases argued this Term. As noted above, the district court has scheduled trial to begin on March 4, 2024, and respondent has appealed. Given the uncertain timing of appellate proceedings in the ordinary course, including potential requests for rehearing en banc, certiorari before judgment is appropriate now to allow the Court to provide the prompt and definitive resolution that the issues presented here require.

Because of the discretionary nature of this Court's consideration of this petition, and to avoid any potential delays, the government is concurrently filing a motion to expedite proceedings in the D.C. Circuit, which currently has jurisdiction over the appeal. As that motion explains, the government is seeking prompt resolution of the appeal in time to allow this Court to hear and decide the case this Term in the event the Court opts not to grant the petition for a writ of certiorari before judgment.

If the Court grants review, the government respectfully requests that it establish a schedule for briefing and argument that would allow the case to be resolved as promptly as possible. Alternatively, if the Court opts not to grant review immediately, the government respectfully suggests that it consider postponing action on the petition pending further proceedings in the court of appeals, so the Court could grant certiorari immediately upon the issuance of a decision by that court. Cf. *DHS* v. *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). And if the Court elects not to review this case at this time, it may wish to note that the court of appeals should proceed with sufficient dispatch to

permit the Court to hear this case promptly during its currently scheduled argument sessions for this Term. See, *e.g.*, *Trump* v. *Hawaii*, 583 U.S. 1009 (2017) (Mem.).

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

JACK L. SMITH
  *Special Counsel*
J. P. COONEY
  *Deputy Special Counsel*
MICHAEL R. DREEBEN
  *Counselor to the Special Counsel*
JAMES I. PEARCE
  *Assistant Special Counsel*

DECEMBER 2023

# APPENDIX

## TABLE OF CONTENTS

Page

Appendix A  —  District court memorandum opinion
(Dec. 1, 2023) .......................................... 1a

Appendix B  —  Constitutional provisions:
U.S. Const. Amend. V ...................... 60a
U.S. Const. Art. I, § 3, Cl. 7 ............. 60a
U.S. Const. Art. II, § 1, Cl. 1............ 60a

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————

Criminal Action No. 23-257 (TSC)

UNITED STATES OF AMERICA

*v.*

DONALD J. TRUMP, DEFENDANT

———————

Filed:   Dec. 1, 2023

———————

## MEMORANDUM OPINION

———————

The United States has charged former President Donald J. Trump with four counts of criminal conduct that he allegedly committed during the waning days of his Presidency.   *See* Indictment, ECF No. 1.   He has moved to dismiss the charges against him based on Presidential immunity, ECF No. 74 ("Immunity Motion"), and on constitutional grounds, ECF No. 113 ("Constitutional Motion").[1]   For the reasons set forth below, the court will DENY both motions.

———————

[1] Defendant has also moved to dismiss based on statutory grounds, ECF No. 114, and for selective and vindictive prosecution, ECF No. 116.   The court will address those motions separately. The Supreme Court has "repeatedly   . . .   stressed the importance of resolving immunity questions at the earliest possible stage in litigation."   *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted).   The court therefore rules first on the Immunity Motion and the Constitutional Motion—in which Defendant as-

## I.  BACKGROUND

At the motion to dismiss stage, the court assumes the truth of the Indictment's allegations.  *See, e.g.*, *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022). Defendant contends that the charges in the Indictment are based on his "public statements and tweets about the federal election and certification," "communications with the U.S. Department of Justice about investigating elections crimes and possibly appointing a new Acting Attorney General," "communications with state officials about the federal election and the exercise of their official duties with respect to the election," "communications with the Vice President and Members of Congress about the exercise of their official duties in the election-certification proceedings," and "organizing slates of electors as part of the attempt to convince legislators not to certify the election against defendant."  Immunity Motion at 3-8 (formatting modified).  Those generalized descriptions fail to properly portray the conduct with which he has been charged.  Accordingly, the court will briefly review the central allegations as set forth in the Indictment.

Defendant "was the forty-fifth President of the United States and a candidate for re-election in 2020."  Indictment ¶ 1.  "Despite having lost" that election, he "was determined to remain in power," so "for more than two months following election day on November 3, 2020, the Defendant spread lies that there had been outcome-determinative fraud in the election and that he had actually won."  *Id.* ¶ 2.  He "knew that [those claims] were false," but "repeatedly and widely disseminated them

---

serts "constitutional immunity from double jeopardy," *United States v. Scott*, 464 F.2d 832, 833 (D.C. Cir. 1972).

anyway—to make his knowingly false claims appear legitimate, create an intense national atmosphere of mistrust and anger, and erode public faith in the administration of the election." *Id.*; *see id.* ¶ 12 (listing six such claims). "In fact, the Defendant was notified repeatedly that his claims were untrue—often by the people on whom he relied for candid advice on important matters, and who were best positioned to know the facts and he deliberately disregarded the truth." *Id.* ¶ 11. Those people included the Vice President, "senior leaders of the Justice Department," the Director of National Intelligence, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, "Senior White House attorneys," "Senior staffers on the Defendant's 2020 re-election campaign," state legislators and officials, and state and federal judges. *Id.*

"Defendant also pursued unlawful means of discounting legitimate votes and subverting the election results." *Id.* ¶ 4. Specifically, he "targeted a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the presidential election." *Id.* The Indictment describes that process:

The Constitution provided that individuals called electors select the president, and that each state determine for itself how to appoint the electors apportioned to it. Through state laws, each of the fifty states and the District of Columbia chose to select their electors based on the popular vote in the state. After election day, the [Electoral Count Act ("ECA")] required each state to formally determine—or 'ascertain'—the electors who would represent the state's voters by casting electoral votes on behalf of the candidate who

had won the popular vote, and required the executive
of each state to certify to the federal government the
identities of those electors. Then, on a date set by
the ECA, each state's ascertained electors were re-
quired to meet and collect the results of the presiden-
tial election—that is, to cast electoral votes based on
their state's popular vote, and to send their electoral
votes, along with the state executive's certification
that they were the state's legitimate electors, to the
United States Congress to be counted and certified
in an official proceeding. Finally, the Constitution
and ECA required that on the sixth of January fol-
lowing election day, the Congress meet in a Joint Ses-
sion for a certification proceeding, presided over by
the Vice President as President of the Senate, to
count the electoral votes, resolve any objections, and
announce the result—thus certifying the winner of
the presidential election as president-elect.

*Id.* ¶ 9.

Defendant, along with at least six co-conspirators, *id.*
¶ 8, undertook efforts "to impair, obstruct, and defeat
[that process] through dishonesty, fraud, and deceit,"
*id.* ¶ 10. Those efforts took five alleged forms:

*First*, they "used knowingly false claims of election
fraud to get state legislators and election officials to sub-
vert the legitimate election results and change electoral
votes for the Defendant's opponent, Joseph R. Biden,
Jr., to electoral votes for the Defendant." *Id.* ¶ 10(a).
"That is, on the pretext of baseless fraud claims, the De-
fendant pushed officials in certain states to ignore the
popular vote; disenfranchise millions of voters; dismiss
legitimate electors; and ultimately, cause the ascertain-

ment of and voting by illegitimate electors in favor of the Defendant." *Id.*; *see id.* ¶¶ 13-52.

*Second*, they "organized fraudulent slates of electors in seven targeted states (Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin), attempting to mimic the procedures that the legitimate electors were supposed to follow under the Constitution and other federal and state laws." *Id.* ¶ 10(b). "This included causing the fraudulent electors to meet on the day appointed by federal law on which legitimate electors were to gather and cast their votes; cast fraudulent votes for the Defendant; and sign certificates falsely representing that they were legitimate electors." *Id.*; *see id.* ¶¶ 53-69. They "then caused these fraudulent electors to transmit their false certificates to the Vice President and other government officials to be counted at the certification proceeding on January 6," 2021. *Id.* ¶ 10(b); *see id.* ¶¶ 53-69.

*Third*, they "attempted to use the power and authority of the Justice Department to conduct sham election crime investigations and to send a letter to the targeted states that falsely claimed that the Justice Department had identified significant concerns that may have impacted the election outcome; that sought to advance the Defendant's fraudulent elector plan by using the Justice Department's authority to falsely present the fraudulent electors as a valid alternative to the legitimate electors; and that urged, on behalf of the Justice Department, the targeted states' legislatures to convene to create the opportunity to choose the fraudulent electors over the legitimate electors." *Id.* ¶ 10(c); *see id.* ¶¶ 70-85.

*Fourth*, "using knowingly false claims of election fraud," they "attempted to convince the Vice President to use the Defendant's fraudulent electors, reject legitimate electoral votes, or send legitimate electoral votes to state legislatures for review rather than counting them." *Id.* ¶ 10(d). "When that failed, on the morning of January 6," they "repeated knowingly false claims of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused." *Id.*; *see id.* ¶¶ 86-105.

*Fifth*, "on the afternoon of January 6," once "a large and angry crowd—including many individuals whom the Defendant had deceived into believing the Vice President could and might change the election results—violently attacked the Capitol and halted the proceeding," they "exploited the disruption by redoubling efforts to levy false claims of election fraud and convince members of Congress to further delay the certification based on those claims." *Id.* ¶ 10(e); *see id.* ¶¶ 106-124.

Based on this conduct, the Indictment charges Defendant with four counts: Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371, *id.* ¶ 6; Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k), *id.* ¶ 126; Obstruction of, and Attempt to Obstruct, an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2, *id.* ¶ 128; and Conspiracy Against Rights, in violation of 18 U.S.C. § 241, *id.* ¶ 130.

## II.   LEGAL STANDARD

A criminal defendant may move to dismiss based on a "defect in the indictment," such as a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). That motion may be based—as it is here—on constitutional challenges to the prosecution, including the assertion of immunity. *See, e.g.*, *United States v. Stone*, 394 F. Supp. 3d 1, 8 (D.D.C. 2019). "Because a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual circumstances." *United States v. Fischer*, 64 F.4th 329, 334-35 (D.C. Cir. 2023) (formatting modified).

## III.   EXECUTIVE IMMUNITY

Defendant contends that the Constitution grants him "absolute immunity from criminal prosecution for actions performed within the 'outer perimeter' of his official responsibility" while he served as President of the United States, so long as he was not both impeached and convicted for those actions. Immunity Motion at 8, 11-13 (formatting modified). The Constitution's text, structure, and history do not support that contention. No court—or any other branch of government—has ever accepted it. And this court will not so hold. Whatever immunities a sitting President may enjoy, the United States has only one Chief Executive at a time, and that position does not confer a lifelong "get-out-of-jail-free" pass. Former Presidents enjoy no special conditions on their federal criminal liability. Defendant may be subject to federal investigation, indictment, prosecution, conviction, and punishment for any criminal acts undertaken while in office.

### A.  Text

In interpreting the Constitution, courts ordinarily "begin with its text," *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), but there is no provision in the Constitution conferring the immunity that Defendant claims. The Supreme Court has already noted "the absence of explicit constitutional  .  .  .  guidance" on whether a President possesses any immunity.  *Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982) ("*Fitzgerald*"); *see also United States v. Nixon*, 418 U.S. 683, 705-06 n.16 (1974) ("*Nixon*") (observing "the silence of the Constitution" regarding a President's immunity from criminal subpoenas).  The Executive Branch has likewise recognized that "the Constitution provides no explicit immunity from criminal sanctions for any civil officer," including the current President.  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 U.S. Op. Off. Legal Counsel 222, 2000 WL 33711291, at *9 (2000) ("OLC Immunity Memo") (quoting Memorandum for the United States Concerning the Vice President's Claim of Constitutional Immunity at 4 (filed Oct. 5, 1973), *In re Proceedings of the Grand Jury Impaneled December 5, 1972:  Application of Spiro T. Agnew, Vice President of the United States* (D. Md. 1973) (No. 73-965) ("1973 SG Memo"), *available at* 27 Hofstra L. Rev. 677, 775-97 (Appendix)) (alterations adopted).  There is no "Presidential Immunity" Clause.

The lack of constitutional text is no accident; the Framers explicitly created immunity for other officials. The Constitution's Speech and Debate Clause provides that "Senators and Representatives  .  .  .  shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at

the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. And some Founding-Era state constitutions, like those of Virginia and Delaware, unequivocally protected their Governor from certain penal sanctions, at least until "he [was] out of office." Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 69 (2021) (quoting Va. Const. of 1776, art. XVI); *accord id.* at 69-70 (quoting Del. Const. of 1776, art. XXIII). The U.S. Constitution contains no equivalent protections for the President.

Nor is the Constitution silent on the question because its drafters and ratifiers assumed the President would enjoy the immunity Defendant claims. To the contrary, America's founding generation envisioned a Chief Executive wholly different from the unaccountable, almost omnipotent rulers of other nations at that time. In Federalist No. 69—titled "The Real Character of the Executive"—Alexander Hamilton emphasized the "total dissimilitude between [the President] and the king of Great Britain," the latter being "sacred and inviolable" in that "there is no constitutional tribunal to which he is amenable; no punishment to which he can be subjected." *The Federalist Papers by Alexander Hamilton, James Madison and John Jay* 348-49 (Garry Hamilton's contemporary commentators universally affirmed the crucial distinction that the President would at some point be subject to criminal process. *See* Prakash, 100 Tex. L. Rev. at 71-75 (collecting commentary); Response, Brian C. Kalt, *Criminal Immunity and Schrödinger's President: A Response to* Prosecuting and Punishing Our Presidents, 100 Tex. L. Rev. Online 79, 83-85 (2021)

(acknowledging Founding-Era consensus that Presidents would lack absolute criminal immunity, but noting that most commentary was ambiguous about whether prosecution could occur during Presidency, or only after). That widely acknowledged contrast between the President and a king is even more compelling for a former President. The Constitution's silence on former Presidents' criminal immunity thus does not reflect an understanding that such immunity existed. Wills ed. 1982).[2] Hamilton's contemporary commentators universally affirmed the crucial distinction that the President would at some point be subject to criminal process. *See* Prakash, 100 Tex. L. Rev. at 71-75 (collecting commentary); Response, Brian C. Kalt, *Criminal Immunity and Schrödinger's President: A Response to* Prosecuting and Punishing Our Presidents, 100 Tex. L. Rev. Online 79, 83-85 (2021) (acknowledging Founding-Era consensus that Presidents would lack absolute criminal immunity, but noting that most commentary was ambiguous about whether prosecution could occur during Presidency, or only after). That widely acknowledged contrast between the President and a king is even more compelling for a former President. The Constitution's silence on former Presidents' criminal immunity thus does not reflect an understanding that such immunity existed.

Lacking an express constitutional provision, Defendant hangs his textual argument for immunity on the Impeachment Judgment Clause, but it cannot bear the weight he places on it. The Clause provides:

---

[2] All subsequent citations to the Federalist Papers refer to this edition, and the Papers are also available online at https://avalon.law.yale.edu/subject_menus/fed.asp.

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States:   but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, §3, cl.7.   From this language, Defendant concludes "that the President may be charged by indictment only in cases where the President has been impeached and convicted by trial in the Senate." Immunity Motion at 11.   But Defendant is not President, and reading the Clause to grant absolute criminal immunity to former Presidents would contravene its plain meaning, original understanding, and common sense.

The Clause has two parts.   The first limits the penalties of impeachment to removal and disqualification from office.   That limit marked a deliberate departure from the prevailing British tradition, in which an impeachment conviction "might result in a wide array of criminal penalties, including fines, imprisonment, and even execution."   *Whether A Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 U.S. Op. Off. Legal Counsel 110, 2000 WL 33711290, at *7 (2000) ("OLC Double Jeopardy Memo") (citing 2 Joseph Story, *Commentaries on the Constitution of the United States* 251-2 (1833; reprint 1994) ("*Story's Commentaries*"); 2 Richard Wooddeson, *A Systematical View of the Laws of England* 611-14 (1792); Raoul Berger, *Impeachment:   The Constitutional Problems* 67 (1974)).   The second part of the

Clause provides, however, that impeachment's limits do not preclude "the Party convicted" from later criminal prosecution in the courts—*i.e.*, that "further punishment[] . . . would still be available but simply not to the legislature." *Id.* at *10.

Both parts of the Clause undercut Defendant's interpretation of it. The first begins by defining the Clause's scope: "Judgment in Cases of Impeachment," indicating that the Clause is aimed primarily at identifying the permissible penalties associated with impeachment itself. The Clause's second part confirms that purview. Rather than stating that "the Party convicted shall *only then* be liable" to criminal prosecution, the Clause states that "the Party convicted shall *nevertheless* be liable." U.S. Const. art. I, § 3, cl. 7 (emphasis added). At the Founding, as now, "nevertheless" meant "notwithstanding that," and "notwithstanding that" meant "[w]ithout hindrance or obstruction from." *Neverthele'ss*, Samuel Johnson, *A Dictionary Of The English Language* (1978) (4th ed. 1773), *available at* https://perma.cc/ST8E-RCMB; *id.*, *Notwithsta'nding*, *available at* https://perma.cc/A9ML-QK4Y. In the Impeachment Judgment Clause, the word "nevertheless" in the second part thus signifies that the first part—constraining impeachment's penalties—does not bear on whether the Party would also be subject to criminal prosecution. *See* OLC Immunity Memo at *2 (citing *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (1973) ("1973 OLC Memo"), *available at* https://perma.cc/DM28-LHT9). As discussed at greater length below, the Clause's manifest purpose—and originally understood effect—was therefore "to permit criminal prosecution in spite of the prior adjudication by

the Senate, *i.e.*, to forestall a double jeopardy argument." *Id.* (citation omitted); *see infra* Section V.B. That is quite different from establishing impeachment and conviction as a prerequisite to a former President's criminal prosecution.

The historical sources that Defendant cites do not move the needle. First, he quotes Alexander Hamilton's twin statements in *The Federalist* that the "President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law," Federalist No. 69 at 348, and that the President would be "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by subsequent prosecution in the common course of law," Federalist No. 77 at 392. Immunity Motion at 12. But those statements merely echo the Clause's clarification that prosecution *may* follow impeachment; they do not say that those events *must* happen in that order. Second, Defendant cites Founding Father James Wilson's remark during the ratification debates that the President "is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment." J. Elliot, *Debates on The Federal Constitution* 480 (2d ed. 1863). But Wilson was describing a President in office, *see id.*, and that description is entirely consistent with a former President—having returned to life "as a citizen"—being subject to criminal prosecution. There is no evidence that any of the Constitution's drafters or ratifiers intended or understood former Presidents to be criminally immune unless they had been impeached and convicted, much less a

widespread consensus that the Impeachment Judgment Clause would have that effect.

In addition to lacking textual or historical support, Defendant's interpretation of the Clause collapses under the application of common sense. For one, his reasoning is based on the logical fallacy of "denying the antecedent." *See, e.g.*, *New LifeCare Hosps. of N.C. LLC v. Azar*, 466 F. Supp. 3d 124, 136 n.7 (D.D.C. 2020). From the statement "if the animal is a cat, it can be a pet," it does not follow that "if the animal is not a cat, it cannot be a pet." Yet Defendant argues that because a President who is impeached and convicted may be subject to criminal prosecution, "a President who is *not* convicted may *not* be subject to criminal prosecution." Immunity Motion at 11. Even assuming that negative implication finds some traction when applied to sitting Presidents, *see, e.g.*, *Trump v. Vance*, 140 S. Ct. 2412, 2444-45 (2020) (Alito, J., dissenting) (discussing that implication); *but see* OLC Immunity Memo at *2-3 (restating the 1973 OLC Memo's rejection of the implication); *see also infra* Section V.B (discussing the implication for double jeopardy purposes), the logic certainly does not hold for former Presidents. That is because there is another way, besides impeachment and conviction, for a President to be removed from office and thus subjected to "the ordinary course of law," Federalist No. 69 at 348: As in Defendant's case, he may be voted out. The President "shall hold his Office during the Term of four Years." U.S. Const. art. II, § 1, cl. 1. Without reelection, the expiration of that term ends a Presidency as surely as impeachment and conviction. *See United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, Circuit Justice) ("[T]he president is elected from the mass of the people, and, on the expiration of the time

for which he is elected, returns to the mass of the people again."). Nothing in the Impeachment Judgment Clause prevents criminal prosecution thereafter.

Defendant's reading of the Impeachment Judgment Clause also proves too much. If the Clause required impeachment and conviction to precede criminal prosecution, then that requirement would apply not only to the President, but also to the "Vice President and all civil Officers of the United States"—who may likewise be impeached. U.S. Const. art. II, § 4. "The constitutional practice since the Founding, however, has been to prosecute and even imprison civil officers other than the President . . . prior to their impeachment." OLC Immunity Memo at *2 (citing 1973 OLC Memo at 4-7 (collecting sources)). For instance, then-Vice President Aaron Burr was indicted without being impeached, *see* 1973 SG Memo at 12, and the same fate might have befallen Vice President Spiro Agnew had he not resigned and entered a *nolo contendere* plea, *see United States v. Agnew*, 428 F. Supp. 1293, 1293 (D. Md. 1977). Not only would Defendant's interpretation contradict that long-settled practice, it would also introduce significant "complications into criminal proceedings" for all current and former federal officials, including "threshold constitutional questions" of "whether the suspect is or was an officer of the United States," and "whether the offense is one for which he could be impeached." OLC Immunity Memo at *3 (citing 1973 OLC Memo at 7). The clash with historical practice and difficulties in application that would flow from Defendant's interpretation further confirm that it cannot be the correct reading of the Clause.

Finally, Defendant's interpretation of the Impeachment Judgment Clause would produce implausibly perverse results. The Constitution permits impeachment and conviction for a limited category of offenses: "Treason, Bribery, or other high Crimes and Misdemeanors." U.S. Const. art. II, § 4. Under Defendant's reading, if a President commits a crime that does not fall within that limited category, and so could not be impeached and convicted, the President could never be prosecuted for that crime. Alternatively, if Congress does not have the opportunity to impeach or convict a sitting President —perhaps because the crime occurred near the end of their term, or is covered up until after the President has left office—the former President similarly could not be prosecuted. Defendant seems to suggest that this scenario, in which the former President would be utterly unaccountable for their crimes, is simply the price we pay for the separation of powers. *See* Reply in Support of Immunity Motion, ECF No. 122, at 6 (quoting *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting) ("While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty.")).[3] That cannot be the Clause's meaning. The constitutional limits on impeachment's penalties do not license a President's criminal impunity.

---

[3] Even assuming that former as well as sitting Presidents may be impeached, this hypothetical would still produce problematic results. Congress could enable a former President's criminal prosecution by impeaching them after they have left office. But it would raise serious separation of powers concerns to restrain the core executive act of prosecuting a private citizen—as a former President would then be—until Congress chose to do so. *See infra* Section III. B.2.

In sum, nothing in the Constitution's text supplies the immunity that Defendant claims. To be sure, "a specific textual basis has not been considered a prerequisite to the recognition of immunity," and so the inquiry is not confined to the express terms of our founding charter. *Fitzgerald*, 457 U.S. at 750 n.31. But the lack of supporting constitutional text does mean that a former President's federal criminal immunity, if it exists, must arise entirely from "concerns of public policy, especially as illuminated by our history and the structure of our government." *Id.* at 747-48. Defendant's resort to those principles fares no better.

## B. Structure

The Supreme Court has cautioned against forms of Presidential liability that "rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997). But the prospect of federal criminal liability for a former President does not violate that structural principle, either by imposing unacceptable risks of vexatious litigation or by otherwise chilling the Executive's decision-making process. Indeed, it is likely that a President who knows that their actions may one day be held to criminal account will be motivated to take greater care that the laws are faithfully executed. More fundamentally, federal criminal liability is essential to the public's interest in our "historic commitment to the rule of law . . . nowhere more profoundly manifest than in our view that 'the twofold aim of criminal justice is that guilt shall not escape or innocence suffer.'" *Nixon*, 418 U.S. at 708-09 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)) (formatting modified). The Presidency's unique

responsibilities do not exempt its former occupants from that commitment.

In *Fitzgerald*, the Supreme Court explained the structural analysis for Presidential immunity. In that case, civil plaintiff A. Ernest Fitzgerald claimed that President Richard Nixon had been involved in unlawfully firing him from his government job and sought money damages against the former President. 457 U.S. at 733-41. The five-Justice majority noted it was "settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Id.* at 753-54 (citations omitted). But it instructed that "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 754 (citations omitted). "When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance, or to vindicate the public interest in an ongoing criminal prosecution—the exercise of jurisdiction has been held warranted." *Id.* (first citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), then citing *Nixon*, 418 U.S. 731). Ultimately, the Court found that a "merely private suit for damages based on a President's official acts" did not serve those interests, and held that a former President could remain immune from such suits. *Id.* For a federal criminal prosecution, however, the analysis comes out the other way.

1. Burdens on the Presidency

At the outset, it bears noting that it is far less intrusive on the functions of the Executive Branch to prose-

cute a former President than a sitting one. The Supreme Court has accepted at least "the initial premise" that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697-98. And the Office of Legal Counsel has identified three burdens of criminal prosecution that could impede the performance of that constitutional role:

> (a) the actual imposition of a criminal sentence of incarceration, which would make it physically impossible for the President to carry out his duties; (b) the public stigma and opprobrium occasioned by the initiation of criminal proceedings, which could compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs; and (c) the mental and physical burdens of assisting in the preparation of a defense for the various stages of the criminal proceedings, which might severely hamper the President's performance of his official duties.

OLC Immunity Memo at *19. But none of those burdens would result from the criminal prosecution of a former President, who is no longer performing official duties. Accordingly, the separation-of-powers concerns are significantly diminished in this context.

*Fitzgerald* nonetheless suggested that the prospect of post-Presidency civil liability might "distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." 457 U.S. at 753. The Supreme Court highlighted two concerns: (1) the public interest in providing the President "the maximum

ability to deal fearlessly and impartially with the duties of his office," and (2) the fact that given the "visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages." *Id.* at 752-53 (quotation omitted). Defendant correspondingly focuses his arguments for immunity on (1) "the chilling effect personal liability would have on the President's decision-making," and (2) the "potential criminal prosecutions" former Presidents could face from "local, state, or subsequent federal officials." Immunity Motion at 9-10. He contends that "[c]ognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 10 (quoting *Fitzgerald*, 457 U.S. at 753).

Those concerns do not carry the same weight in the context of a former President's federal criminal prosecution. First, the Supreme Court has largely rejected similar claims of a "chilling effect" from the possibility of future criminal proceedings. During the Watergate prosecution, President Nixon argued that if recordings of his conversations were subject to criminal subpoena, the Presidential decision-making process would be compromised because his staff would be less candid. *Nixon*, 418 U.S. at 705-06. The Court disagreed, stating that it "cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." *Id.* at 712. The Court quoted Justice Cardozo's unanimous opinion finding that a jury's decision-making process would not be meaning-

fully chilled if jurors' conduct were later subject to criminal prosecution:

> A juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence of malice. He will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor. The chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice.

*Id.* n.20 (quoting *Clark v. United States*, 289 U.S. 1, 16 (1933)).

The same reasoning applies here. There is no doubt that "a President must concern himself with matters likely to arouse the most intense feelings." *Fitzgerald*, 457 U.S. at 752 (internal quotation marks omitted). But "[c]riminal conduct is not part of the necessary functions performed by public officials." *United States v. Isaacs*, 493 F.2d 1124, 1144 (7th Cir. 1974). By definition, the President's duty to "take Care that the Laws be faithfully executed" does not grant special latitude to violate them. U.S. Const., art. II, § 3. That is especially true when the violations require criminal intent, as is the case here, *see* Opp'n to Immunity Motion, ECF No. 109, at 31-32 (reviewing *mens rea* requirements for the Indictment's four counts); *cf. Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (noting that even public officials "cloaked with absolute civil immunity . . . could be punished criminally" for their "willful acts"). Like his fellow citizens serving on juries, then, a President "of integrity and reasonable firmness" will not fear to carry

out his lawful decision-making duties—even on hot-button political issues—and "will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor." *Clark*, 289 U.S. at 16. The rationale for immunizing a President's controversial decisions from civil liability does not extend to sheltering his criminality.

Indeed, the possibility of future criminal liability might encourage the kind of sober reflection that would reinforce rather than defeat important constitutional values. If the specter of subsequent prosecution encourages a sitting President to reconsider before deciding to act with criminal intent, that is a benefit, not a defect. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Consequently, to the extent that there are any cognizable "chilling effects" on Presidential decision-making from the prospect of criminal liability, they raise far lesser concerns than those discussed in the civil context of *Fitzgerald*. Every President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them.

Second, the possibility of vexatious post-Presidency litigation is much reduced in the criminal context. Defendant protests that denying him immunity would subject future Presidents to "prosecution in countless federal, state, and local jurisdictions across the country," Immunity Motion at 10, but that is incorrect. To begin, Defendant is only charged with federal crimes in this case, so any ruling here will be limited to that context and would not extend to state or local prosecutions—

which in any event might run afoul of the Supremacy Clause, *see Vance*, 140 S. Ct. at 2428 ("The Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties. . . . Any effort to manipulate a President's policy decisions or to 'retaliat[e]' against a President for official acts . . . would thus be an unconstitutional attempt to 'influence' a superior sovereign 'exempt' from such obstacles." (citations omitted)). And as Defendant well knows, *see infra* Section V.A, a person cannot "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const., amend. V. Consequently, denying Defendant immunity here means only that a former President may face one federal prosecution, in one jurisdiction, for each criminal offense allegedly committed while in office. That consequence stands in contrast to the civil context, where "the effect of [the President's] actions on countless people" could result in untold numbers of private plaintiffs suing for damages based on any number of Presidential acts. *Fitzgerald*, 457 U.S. at 753.

Defendant also warns that if he is not given immunity here, criminal prosecutions will "bedevil[] every future Presidential administration and usher[] in a new era of political recrimination and division." Immunity Motion at 11. But, as the Supreme Court noted when faced with a similar argument in *Clinton*, that "predictive judgment finds little support in either history or the relatively narrow compass of the issues raised in this particular case." 520 U.S. at 702. As Defendant acknowledges, he is the only former President in United States history to face criminal charges for acts committed while in office. *See* Immunity Motion at 15. "If the past is any indicator, it seems unlikely that a deluge

of such litigation will ever engulf the Presidency."
*Clinton*, 520 U.S. at 702. Despite Defendant's doom-
saying, he points to no evidence that his criminal liability
in this case will open the gates to a waiting flood of fu-
ture federal prosecutions.

The robust procedural safeguards attendant to fed-
eral criminal prosecutions further reduce the likelihood
that former Presidents will be unjustly harassed. Prose-
cutors themselves are constitutionally bound to not
abuse their office, which is why "courts presume that
they have properly discharged their official duties."
*United States v. Armstrong*, 517 U.S. 456, 464 (1996)
(quoting *United States v. Chem. Found., Inc.*, 272 U.S.
1, 14-15 (1926)). And a federal indictment is issued by
a grand jury, which is similarly "prohibited from engag-
ing in 'arbitrary fishing expeditions' and initiating inves-
tigations 'out of malice or an intent to harass.'" *Vance*,
140 S. Ct. at 2428 (quoting *United States v. R. Enters.,
Inc.*, 498 U.S. 292, 299 (1991)). Even after indictment,
"in the event of such harassment, a [former] President
would be entitled to the protection of federal courts,"
which "have the tools to deter and, where necessary, dis-
miss" vexatious prosecutions. *Id.* For instance, if a
prosecution is politically motivated, as Defendant has
argued in this case, that alone may warrant dismissal.
*See* Motion to Dismiss Case for Selective and Vindictive
Prosecution, ECF No. 116. And if a meritless prosecu-
tion somehow reached trial, a former President would
still have the opportunity to put the government's proof
to the test. *See* U.S. Const., art. III, § 2, cl. 3.

In short, the concerns discussed in the civil context
of *Fitzgerald* find no meaningful purchase here. A for-
mer President accused of committing a crime while in

office will be subject to only one federal prosecution for that offense, which in turn will only result in conviction if the grand jury finds probable cause and the prosecutor, judge, and all twelve petit jurors agree that the charges are legitimate and have been proven beyond a reasonable doubt. Throughout that process, a former President "may avail himself of the same protections available to every other citizen." *Vance*, 140 S. Ct. at 2430. In the rare case when a former President must do so, the Constitution does not proffer the sledgehammer of absolute immunity where the scalpel of procedural protections will suffice. *See Burr*, 25 F. Cas. at 34 ("The guard, furnished to this high officer [the President], to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstance which is to [] precede their being issued."). The possibility of future harassing federal criminal prosecution will not cast so "serious" a shadow on the Presidency that its current occupant cannot fulfill its duties. *Clinton*, 520 U.S. at 708.

2. <u>Public interest</u>

On the other of side of the scale, the public interest in the prosecution of this case carries grave weight. The Supreme Court has repeatedly underscored its judgment that "the public interest in fair and accurate judicial proceedings is at its height in the criminal setting." *Vance*, 140 S. Ct. at 2424. It has correspondingly refused to permit other concerns, including those asserted by Presidents, to "prevail over the fundamental demands of due process of law in the fair administration of criminal justice." *Nixon*, 418 U.S. at 713; *see United States v. Gillock*, 445 U.S. 360, 373 (1980) (con-

cluding that "principles of comity" must yield "where important federal interests are at stake, as in the enforcement of federal criminal statutes"). Despite their other vehement disagreements in *Fitzgerald*, all nine Justices unanimously endorsed that judgment with respect to former Presidents. Justice Powell's majority opinion specifically contrasted the "lesser public interest in actions for civil damages than . . . in criminal prosecutions." 457 at 754 n.37. Chief Justice Burger's concurrence made the same distinction. *Id.* at 759-60 (distinguishing immunity "limited to civil damages claims" from "a *criminal* prosecution," as in *Burr* or *Nixon* (emphasis in original)). And Justice White's four-member dissent stressed that no party had argued "that the President is immune from criminal prosecution in the courts[,] . . . [n]or would such a claim be credible." *Id.* at 780. *Fitzgerald* was thus undivided in contemplating that the public interest could require a former President's criminal liability.

Defendant resists that consensus in *Fitzgerald* by pointing to a single passage in the majority opinion where, in listing the "formal and informal checks" that could replace civil liability as a deterrent for Presidential misconduct, the Court did not specifically list criminal liability. *Id.* at 757. From that omission, Defendant infers that the Court intended to suggest that criminal liability would not be available either. Immunity Motion at 13. But the Court's unanimous emphasis that it was not immunizing former Presidents from federal criminal liability squarely refutes that inference. If anything, the omission underscores that civil and criminal liability are so fundamentally distinct that they cannot be understood as substitutes for one another. Accordingly, in the parallel context of cases "which have

recognized an immunity from civil suit for state officials," the Supreme Court has explicitly "presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." *Gillock*, 445 U.S. at 372.

It is no surprise that the Supreme Court has long recognized the special public interest in criminal law because of its distinctly communal character; that character is reflected in both the Constitution itself and the legal tradition from which it arose. Unlike defendants in a civil matter, for example, federal criminal defendants are constitutionally guaranteed "a speedy and public trial" before a jury drawn from their community. U.S. Const., amend VI; *id.*, art. III, § 2, cl. 3. And the preeminent 18th-century legal commentator William Blackstone explained the reason for the community's special involvement in criminal cases: Whereas civil injuries "are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals," crimes "are a breach and violation of the public rights and duties due to the whole community, considered as a community." 4 William Blackstone, *Commentaries* *5. The fundamentally public interest in a criminal prosecution explains why it "may proceed without the consent of the victim and why it is brought in the name of the sovereign rather than the person immediately injured by the wrong." OLC Immunity Memo at *22. Put differently, the very name of this case confirms the public's particular stake in its adjudication: it is the *United States of America v. Donald J. Trump*.

Congress has also affirmed the special public interests in enforcing the criminal law. In the Sentencing Reform Act of 1984, it required every federal court to

consider certain factors in imposing sentence, and declared "the need for the sentence imposed":

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *see* Pub. L. 98-473, title II, § 212(a)(2) (1984). The public has an undisputed interest in promoting respect for the law, deterring crime, protecting itself, and rehabilitating offenders. All of those interests would be thwarted by granting former Presidents absolute criminal immunity.

The fact that Congress has spoken by criminalizing the conduct with which Defendant is charged also highlights the separation of powers principles that counsel in favor of the court retaining jurisdiction over this case. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Congress could have penalized the conduct alleged in this case—if it chose to penalize it at all—with mere civil liability, perhaps allowing for monetary damages should a private plaintiff choose to bring suit. Instead, it expressed a far stronger condemnation by subjecting that conduct to the severe consequences of the criminal law. "Whatever may be the

case with respect to civil liability" for former Presidents, then, "the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'" *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (quoting *Gravel v. United States*, 408 U.S. 606, 627 (1972)). Indeed, stretching the doctrine so far would also "imped[e] . . . the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707, not to mention the current President's duty to enforce the criminal law, *see* U.S. Const., art. II, § 3. Holding a former President absolutely immune would thus impinge on the functions of all three branches with respect to the criminal law: Congress's province to make it, the Executive's prerogative to enforce it, and the Judiciary's charge to apply it.

Most importantly, a former President's exposure to federal criminal liability is essential to fulfilling our constitutional promise of equal justice under the law. "The government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). As the Supreme Court has stated, that principle must govern citizens and officials alike:

> No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it im-

poses upon the exercise of the authority which it gives.

*United States v. Lee*, 106 U.S. 196, 220 (1882).

Perhaps no one understood the compelling public interest in the rule of law better than our first former President, George Washington. His decision to voluntarily leave office after two terms marked an extraordinary divergence from nearly every world leader who had preceded him, ushering in the sacred American tradition of peacefully transitioning Presidential power—a tradition that stood unbroken until January 6, 2021. In announcing that decision, however, Washington counseled that the newfound American independence carried with it a responsibility. "The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government." Washington's Farewell Address, S. Doc. No. 106-21, at 13 (2d Sess. 2000), *available at* https://perma.cc/E5CZ-7NNP. He issued a sober warning: "All obstructions to the execution of the laws," including group arrangements to "counteract" the "regular deliberation and action of the constituted authorities, are destructive of this fundamental principle." *Id.* at 14. In Washington's view, such obstructions would prove "fatal" to the Republic, as "cunning, ambitious, and unprincipled men will be enabled to subvert the power of the people and to usurp for themselves the reins of government, destroying afterwards the very engines which have lifted them to unjust dominion." *Id.*

In this case, Defendant is charged with attempting to usurp the reins of government as Washington forewarned: The Government alleges that, with the help of

political associates, he "spread lies that there had been outcome-determinative fraud in the election and that he had actually won," and "pursued unlawful means of discounting legitimate votes and subverting the election results," all because he "was determined to remain in power." Indictment ¶¶ 2, 4. In asserting absolute executive immunity, Defendant asks not for an opportunity to disprove those allegations, but for a categorical exemption from criminal liability because, in his view, "the indictment is based solely on President Trump's official acts." Immunity Motion at 27-28. That obstruction to the execution of the laws would betray the public interest. "If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring in the judgment).

For all these reasons, the constitutional consequences of federal criminal liability differ sharply from those of the civil liability at issue in *Fitzgerald*. Federal criminal liability will not impermissibly chill the decision-making of a dutiful Chief Executive or subject them to endless post-Presidency litigation. It will, however, uphold the vital constitutional values that *Fitzgerald* identified as warranting the exercise of jurisdiction: maintaining the separation of powers and vindicating "the public interest in an ongoing criminal prosecution." 457 U.S. at 753-54. Exempting former Presidents from the ordinary operation of the criminal justice system, on the other hand, would undermine the foundation of the rule of law that our first former President described: "Respect for its authority, compliance with its laws, [and] acquiescence in its measures"—"duties enjoined by the fundamental maxims of true liberty." Washing-

ton's Farewell Address at 13. Consequently, the constitutional structure of our government does not require absolute federal criminal immunity for former Presidents.

## C. **History**

Nothing in American history justifies the absolute immunity Defendant seeks. As discussed above, *supra* Section III.A, there is no evidence that the Founders understood the Constitution to grant it, and since that time the Supreme Court "has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law." *Imbler*, 424 U.S. at 429. Moreover, the notion that former Presidents cannot face federal criminal charges for acts they took in office is refuted by the "presuppositions of our political history." *Fitzgerald*, 457 U.S. at 745 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)).

Start with the Executive Branch itself. "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others." *Nixon*, 418 U.S. at 703. The Executive's legal representatives—the Solicitor General and Office of Legal Counsel—have expressly and repeatedly concluded that a former President may "be subject to criminal process . . . after he leaves office or is removed therefrom through the impeachment process." OLC Immunity Memo at *12 (citing 1973 OLC Memo and 1973 SG Memo). Naturally, the Special Counsel's decision to bring this case also reflects that judgment, distinguishing the Department of Justice's position that former Presidents retain

civil immunity. *See* Brief for the United States as Amicus Curiae at 3 n.1 (filed Mar. 2, 2023), *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031 (D.C. Cir.). Even on its own, the Executive's longstanding and unwavering position on this issue weighs against this court unilaterally blocking a considered prosecution by conferring absolute immunity.[4]

Historical practice also indicates that a President's actions may later be criminally prosecuted. In the aftermath of Watergate, for example, President Ford granted former President Nixon "full, free, and absolute pardon . . . for all offenses against the United States which he, Richard Nixon, has committed or may have committed or taken part in during" while in office. Gerald Ford, Presidential Statement at 7-8 (Sept. 8, 1974), *available at* https://perma.cc/2GNZ-QQ3D. In so doing, President Ford specifically noted the "serious allegations" that, without a pardon, would "hang like a sword over our former President's head" until he could "obtain a fair trial by jury." *Id.* at 3; *see id. at* 4-5 (expressing concern about Nixon's rights to a presumption of innocence and a speedy trial). And former President

---

[4] Congress, the other political branch, has not spoken directly to this issue. But it has not exempted actions taken during the Presidency from the criminal law, and "[u]nder the authority of Art. II, § 2," it "has vested in the Attorney General the power to conduct the criminal litigation of the United States Government" and "to appoint subordinate officers to assist him," which he has done "in th[is] particular matter[]" by appointing "a Special Prosecutor." *Nixon*, 418 U.S. at 694. The Government also notes the statements of individual members of Congress—including some who voted to acquit Defendant during his impeachment trial—anticipating that Defendant could later be criminally prosecuted for the conduct at issue. *See* Opp'n to Immunity Motion at 14-15.

Nixon formally accepted that "full and absolute pardon for any charges which might be brought against me for actions taken during the time I was President of the United States," calling the pardon a "compassionate act." Richard Nixon, Statement by Former President Richard Nixon at 1 (Sept. 8, 1974), *available at* https://perma.cc/WV43-6E69. Both Ford's pardon and Nixon's acceptance arose from the desire to prevent the former President's potential criminal prosecution, and both specifically refer to that possibility—without which the pardon would have been largely unnecessary. Defendant's view of his own immunity thus stands at odds with that of his predecessors in the Oval Office.

Granting the immunity Defendant seeks would also break with longstanding legal precedent that all government officials—even those immune from civil claims—may be held to criminal account. In *Fitzgerald*, for instance, the Supreme Court analogized former President Nixon's civil immunity to the similar protections provided to judges and prosecutors. 457 U.S. at 745-48. Unlike most government officials, who only receive "qualified" civil immunity, prosecutors and judges have absolute civil immunity due to "the especially sensitive duties" of their office and the public interest in their "liberty to exercise their functions with independence and without fear of consequences." *Id.* at 745-46 (quotation omitted); *see, e.g.*, *Imbler*, 424 U.S. at 431 (state prosecutors possess absolute civil immunity for prosecutions); *Stump v. Sparkman*, 435 U.S. 349, 359-60 (1978) (state judges possess absolute civil immunity for judicial acts). But notwithstanding their absolute civil immunity, prosecutors and judges are "subject to criminal prosecutions as are other citizens." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980); *see Imbler*, 424 U.S. at

429.   Thus, while in *Fitzgerald* the "careful analogy to the common law absolute immunity of judges and prosecutors" demonstrated history's support for the former President's civil immunity, *Vance*, 140 S. Ct. at 2426, here that same history compels the denial of a former President's criminal immunity.

Against the weight of that history, Defendant argues in essence that because no other former Presidents have been criminally prosecuted, it would be unconstitutional to start now.   Immunity Motion at 15-16.   But while a former President's prosecution is unprecedented, so too are the allegations that a President committed the crimes with which Defendant is charged.   *See infra* Section VI.B.   The Supreme Court has never immunized Presidents—much less former Presidents—from judicial process merely because it was the first time that process had been necessary.   *See, e.g.*, *Vance*, 140 S. Ct. at 2424-25; *Clinton*, 520 U.S. at 692; *Nixon*, 418 U.S. at 703; *Burr*, 25 F. Cas. at 32.   The court will not do so here.

In any event, Defendant's reasoning turns the relevant historical analysis on its head.   In *Clinton*, the President likewise argued that the relative dearth of cases in which "sitting Presidents ha[d] been defendants in civil litigation involving their actions prior to taking office" meant that the Constitution afforded him temporary immunity for such claims.   520 U.S. at 692; *see* Brief for the Petitioner, 1996 WL 448096, at *17-18, *Clinton v. Jones*, No. 95-1853 (U.S.).   The Court found instead that the dearth of similar cases meant that there was no "basis of precedent" for the immunity that President Clinton sought—and in fact showed that there was little risk of such litigation impeding the Presidency go-

ing forward. *Clinton*, 520 U.S. at 692, 702. In other words, a defendant cannot claim that history supports their immunity by pointing to the fact that their immunity has never been asserted. Here, as in *Clinton*, that absence of precedent negates rather than validates Defendant's argument that history establishes his immunity from criminal prosecution.

\* \* \*

For these reasons, the court cannot conclude that our Constitution cloaks former Presidents with absolute immunity for any federal crimes they committed while in office. Our nation's "historic commitment to the rule of law" is "nowhere more profoundly manifest than in our view that 'the twofold aim of criminal justice is that guilt shall not escape or innocence suffer.'" *Nixon*, 418 U.S. at 708-09 (quoting *Berger*, 295 U.S. at 88) (formatting modified). Nothing in the Constitution's text or allocation of government powers requires exempting former Presidents from that solemn process. And neither the People who adopted the Constitution nor those who have safeguarded it across generations have ever understood it to do so. Defendant's four-year service as Commander in Chief did not bestow on him the divine right of kings to evade the criminal accountability that governs his fellow citizens. "No man in this country," not even the former President, "is so high that he is above the law." *Lee*, 106 U.S. at 220.

Consistent with its duty to not "decide questions of a constitutional nature unless absolutely necessary to a decision," *Clinton*, 520 U.S. at 690 & n.11 (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)), the court emphasizes the limits of its holding here. It does not decide whether former Presidents retain absolute crim-

inal immunity from non-federal prosecutions, or whether sitting Presidents are entitled to greater immunity than former ones. Similarly, the court expresses no opinion on the additional constitutional questions attendant to Defendant's assertion that former Presidents retain absolute criminal immunity for acts "within the outer perimeter of the President's official" responsibility. Immunity Motion at 21 (formatting modified). Even if the court were to accept that assertion, it could not grant Defendant immunity here without resolving several separate and disputed constitutional questions of first impression, including: whether the President's duty to "take Care that the Laws be faithfully executed" includes within its "outer perimeter" at least five different forms of indicted conduct;[5] whether inquiring into the President's purpose for undertaking each form of that allegedly criminal conduct is constitutionally permissible in an immunity analysis, and whether any Presidential conduct "intertwined" with otherwise constitutionally immune actions also receives criminal immunity. *See id.* at 21-45. Because it concludes that former Presidents do not possess absolute federal criminal immunity for any acts committed while in office, however,

---

[5] As another court in this district observed in a decision regarding Defendant's civil immunity, "[t]his is not an easy issue. It is one that implicates fundamental norms of separation of powers and calls on the court to assess the limits of a President's functions. And, historical examples to serve as guideposts are few." *Thompson v. Trump*, 590 F. Supp. 3d 46, 74 (D.D.C. 2022); *see id.* at 81-84 (performing that constitutional analysis). The D.C. Circuit recently affirmed that district court's decision with an extensive analysis of just one form of conduct—"speech on matters of public concern." *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, slip op. at 23-42 (D.C. Cir. Dec. 1, 2023).

the court need not reach those additional constitutional issues, and it expresses no opinion on them.

## IV.   FIRST AMENDMENT

In his Constitutional Motion, Defendant first argues that the Indictment should be dismissed because it criminalizes his speech and therefore violates the First Amendment.   But it is well established that the First Amendment does not protect speech that is used as an instrument of a crime, and consequently the Indictment —which charges Defendant with, among other things, making statements in furtherance of a crime—does not violate Defendant's First Amendment rights.

### A.   <u>The First Amendment and criminal prosecutions</u>

The First Amendment provides, in relevant part, that "Congress shall make no law   . . .   abridging the freedom of speech."   U.S. Const. amend. I.   Generally, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."   *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. Am. Civ. Liberties Union*, 535 U.S. 564, 573 (2002)).   In restricting the government's power to control speech, the First Amendment "embodies 'our profound national commitment to the free exchange of ideas.'"   *Ashcroft*, 535 U.S. at 573 (citation omitted).

The right to freedom of speech is "not absolute," however.   *Id.*   It is fundamental First Amendment jurisprudence that prohibiting and punishing speech "integral to criminal conduct" does not "raise any Constitutional problem."   *Stevens*, 559 U.S. at 468-69 (citation omitted); *accord Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498-502 (1949).   "Many long established"

criminal laws permissibly "criminalize speech . . . that is intended to induce or commence illegal activities," *United States v. Williams*, 553 U.S. 285, 298 (2008), such as fraud, bribery, perjury, extortion, threats, incitement, solicitation, and blackmail, *see, e.g.*, *Stevens*, 559 U.S. at 468-69 (fraud); *Williams*, 553 U.S. at 298 (incitement, solicitation); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 356 (2010) (bribery); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 244 (4th Cir. 1997) (extortion, threats, blackmail, perjury). Prosecutions for conspiring, directing, and aiding and abetting do not run afoul of the Constitution when those offenses are "carried out through speech." *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655-56 (D.C. Cir. 1994) (directing and aiding and abetting); *see Williams*, 553 U.S. at 298 (conspiring).

### B.  The Indictment does not violate the First Amendment

The Indictment alleges that Defendant used specific statements as instruments of the criminal offenses with which he is charged:  conspiring to fraudulently obstruct the federal function for collecting, counting, and certifying the results of the Presidential election, in violation of 18 U.S.C. § 371 (Count I); corruptly obstructing and conspiring to obstruct Congress's certification of the election results, in violation of 18 U.S.C. §§ 1512(c)(2) and (k) (Counts II and III); and conspiring to deprive citizens of their constitutional right to have their votes counted, in violation of 18 U.S.C § 241 (Count IV). *See* Indictment ¶¶ 5-130.

That Defendant's alleged criminal conduct involved speech does not render the Indictment unconstitutional. The Indictment notes that "Defendant had a right, like every American, to speak publicly about the election and

even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won." *Id.* ¶ 3. And it enumerates Defendant's specific statements only to support the allegations that Defendant joined conspiracies and attempted to obstruct the election certification, such as the allegations that Defendant knowingly made false claims about the election results, *id.* ¶¶ 11-12, and deceived state officials to subvert the election results, *id.* ¶ 13-52. *See, e.g.*, *id.* ¶¶ 12, 19, 22, 31-35, 37, 41, 46, 50, 52 (referencing Defendant's statements). The Indictment therefore properly alleges Defendant's statements were made in furtherance of a criminal scheme.

Defendant argues that the Indictment violates the First Amendment for three primary reasons: (1) the government may not prohibit Defendant's core political speech on matters of public concern, Constitutional Motion at 4-11; (2) "First Amendment protection . . . extends to statements advocating the government to act," *id.* at 12-14 (formatting modified); and (3) Defendant reasonably believed that the 2020 Presidential Election was stolen, *id.* at 15-17.

1. <u>Core political speech on matters of public concern</u>

Defendant first claims that his statements disputing the outcome of the 2020 election is "core political speech" that addresses a "matter[] of public concern." *Id.* at 8-10. Even assuming that is true, "core political speech" addressing "matters of public concern" is not "immunized from prosecution" if it is used to further criminal activity. *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999); *see Stevens*, 559 U.S. at 468-69. That is the case even though Defendant was the President at the time. *See Blassingame v. Trump*, Nos. 22-5069,

22-7030, 22-7031, slip op. at 50 (D.C. Cir. Dec. 1, 2023) (Defendant is not entitled to immunity when he "engages in speech" that "removes him[] from the First Amendment's protections."). As the D.C. Circuit has recognized, "an immunity for all presidential speech on matters of public concern. . . . is 'unsupported by precedent.'" *Id.* at 27 (quoting *Clinton*, 520 U.S. at 695).

In support of his argument, Defendant first invokes various Justices' opinions in *United States v. Alvarez*, 567 U.S. 709 (2012). Constitutional Motion at 4-7. There was no majority opinion in *Alvarez*; a majority of the Justices agreed only that the Stolen Valor Act, which prohibits an individual from falsely representing that they have received "any decoration or medal authorized by Congress for the Armed Forces of the United States," violated the First

Amendment. 567 U.S. at 716, 729-30 (plurality opinion) (Kennedy, J., joined by Roberts. C.J., Ginsburg, J., and Sotomayor, J.); *id.* at 730 (Breyer, J. concurring in the judgment, joined by Kagan, J.). One theme common to both the plurality and concurring opinions, however, was the concern that the Stolen Valor Act prohibited only false statements and *only because of their falsity*. *See id.* at 717-22 (plurality opinion); *id.* at 732 (Breyer, J. concurring). Indeed, each opinion reiterated that laws "implicat[ing] fraud or speech integral to criminal conduct" are constitutional. *Id.* at 721 (plurality opinion); *accord id.* at 734-36 (Breyer, J., concurring in the judgment); *id.* at 747 (Alito, J., dissenting). Because it confirmed that speech involved in the commission of a crime was not protected by the First Amendment, *Alvarez* did not undermine settled precedent al-

lowing the prosecution of speech in furtherance of criminal activity.

Second, Defendant contends that "attempts to prohibit or criminalize claims on political disputes" constitute viewpoint discrimination. Constitutional Motion at 9-10. But Defendant is not being prosecuted for his "view" on a political dispute; he is being prosecuted for acts constituting criminal conspiracy and obstruction of the electoral process. *Supra* Section I. And any political motives Defendant may have had in doing so do not insulate his conduct from prosecution. *E.g.*, *Rahman*, 189 F.3d at 116-17 (mixed motives do not insulate speech from prosecution); *see* Gov.'s Omnibus Opp'n to Def.'s Motions to Dismiss the Indictment on Statutory and Constitutional Grounds, ECF No. 139 at 33 (Opp'n to Constitutional Motion) (collecting other Circuit cases). The Indictment does not unconstitutionally discriminate against Defendant based on viewpoint.

Third, Defendant argues that even if a higher level of scrutiny does not apply to the Indictment, it nonetheless is invalid "under any level of scrutiny" because it is "tailored to violate free-speech rights." Constitutional Motion at 11. Here, however, there is no level of scrutiny that applies, because speech in furtherance of criminal conduct does not receive *any* First Amendment protection. *E.g.*, *Stevens*, 559 U.S. at 468-69. Moreover, Defendant cites no support for his argument that the Indictment is "tailored to *violate* free-speech rights," nor does he explain how the Indictment is so tailored. *See* Constitutional Motion at 11 (emphasis added).

Finally, Defendant argues that the Indictment violates the First Amendment because "*all* the charged conduct constitutes First Amendment protected speech."

Def.'s Reply in Support of Motion to Dismiss Based on Constitutional Grounds, ECF No. 162 at 7-8 ("Constitutional Reply") (emphasis in original). He contends that to qualify as speech in furtherance of criminal conduct, "the speech in question must 'be integral to' some criminal 'conduct' that *is not itself a form of First Amendment-protected speech or expression*." *Id.* (emphasis added). But again, the Indictment does not need to list other kinds of criminal conduct in addition to speech to comply with the First Amendment; the crimes Defendant is charged with violating may be carried out through speech alone. *See Nat'l Org. for Women*, 37 F.3d at 656; *supra* Section IV.A.

2. <u>Statements advocating government action</u>

Defendant next claims the First Amendment protects "statements advocating the government to act." Constitutional Motion at 12-14 (formatting modified). He first contends the Petition Clause of the First Amendment provides an absolute right to make statements encouraging the government to act in a public forum, citing *McDonald v. Smith*, 472 U.S. 479 (1985). Constitutional Motion at 12-13. The Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The Clause protects individuals' ability to "'communicate their will' through direct petitions to the legislature and government officials." *McDonald*, 472 U.S. at 482 (quoting 1 *Annals of Congress* 738 (1789) (James Madison)). In *McDonald*, however, the Supreme Court concluded that the Petition Clause did *not* immunize a person from a libel suit based on letters the individual had sent to the President. *Id.*

at 480-81; *see also* Opp'n to Constitutional Motion at 34. The Court explained that the Petition Clause does not have "special First Amendment status," so "there is no sound basis for granting greater constitutional protection" under the Petition Clause "than other First Amendment expressions." *McDonald*, 472 U.S. at 484-85. Defendant's reliance on the Clause and its interpretation in *McDonald* is therefore unavailing, as the Petition Clause does not prohibit prosecuting Defendant's speech any more than the Speech Clause does. The Petition Clause does not insulate speech from prosecution merely because that speech also petitions the government.

Defendant also invokes *McDonnell v. United States*, 579 U.S. 550 (2016), to argue that allowing this prosecution would risk criminalizing statements once thought to be false that turned out to be true, such as statements made early in the COVID-19 pandemic that masks do not stop the transmission of the virus. Constitutional Motion at 13-14. Not so. First, *McDonnell* did not involve the First Amendment but rather the proper interpretation of "official act" under the federal bribery statute, 18 U.S.C. § 201(b)(2). *McDonell*, 579 U.S. at 566; *see* Opp'n to Constitutional Motion at 34 n.14. And neither the Indictment nor the federal statutes under which Defendant is charged involve an "official act." Second, Defendant is not being prosecuted simply for making false statements, *see supra* at 33-34, but rather for knowingly making false statements in furtherance of a criminal conspiracy and obstructing the electoral process. Consequently, there is no danger of a slippery slope in which inadvertent false statements alone are alleged to be the basis for criminal prosecution.

In his Reply brief, Defendant also raises overbreadth, arguing that under the Government's interpretation, the underlying statutes charged in the Indictment are unconstitutional because they "criminalize a wide range of perfectly ordinary acts of public speech and petitioning the government." Constitutional Reply at 9-10. Assuming Defendant's overbreadth challenge was properly raised for the first time in his Reply brief, the statutes are not overbroad under the Government's view. As an initial matter, Defendant's actions are not entitled to First Amendment protection as "perfectly ordinary acts of public speech and petitioning the government." *Supra* Section IV.B.1-2; *infra* Section IV.B.3. Moreover, Defendant fails to identify any protected acts or speech that the statutes might render impermissible under the Government's interpretation. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 769-70 (2023) (A litigant must "demonstrate[] that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep'" to succeed in overbreadth challenge (citation omitted)).

3. Defendant's statements on the 2020 Presidential Election

Finally, Defendant claims the First Amendment does not permit the government to prosecute him for his reasonable belief that the 2020 Presidential Election was stolen. Constitutional Motion at 15-17. He argues that the truth or falsity of his belief is not "easily verifiable" and there is "abundant public evidence providing a reasonable basis" for his view. *Id.* at 15-16. He contends that he is "entitled to mistrust the word of . . . establishment-based government officials and draw [his] own inferences from the facts." *Id.* at 17. At this

stage, however, the court must take the allegations in the Indictment as true, *supra* Section II, and the Indictment alleges that Defendant made statements that he knew were false, *e.g.*, Indictment ¶¶ 11-12; *see also* Opp'n to Constitutional Motion at 26-27. While Defendant challenges that allegation in his Motion, and may do so at trial, his claim that his belief was reasonable does not implicate the First Amendment. If the Government cannot prove beyond a reasonable doubt at trial that Defendant knowingly made false statements, he will not be convicted; that would not mean the Indictment violated the First Amendment.

## V. DOUBLE JEOPARDY

Defendant's Constitutional Motion next posits that the prosecution violates double jeopardy because Defendant was tried—and acquitted—in earlier impeachment proceedings arising out of the same course of conduct. Constitutional Motion at 18-24. But neither traditional double jeopardy principles nor the Impeachment Judgment Clause provide that a prosecution following impeachment acquittal violates double jeopardy.

## A. Double Jeopardy Clause

The Fifth Amendment provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. To "be twice put in jeopardy of life or limb" means to face the possibility of "multiple *criminal* punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 99 (citation omitted) (emphasis in original). A purportedly civil penalty only counts in the double jeopardy context if "the statutory scheme was so punitive in either purpose or effect . . . as to 'transform'" it into a criminal penalty. *Id.* (citation omitted).

As long as separate prosecutions charge an individual with violating different laws, the prosecutions are considered separate "offenses" under the Double Jeopardy Clause and the second prosecution passes constitutional muster. *Denezpi v. United States*, 596 U.S. 591, 597-98 (2022). When the same "act or transaction" violates two distinct provisions of the same statute, there are distinct offenses only if "each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). In contexts involving different sovereigns—such as the federal government and a state government—a person may be tried for violating laws that "have identical elements and could not be separately prosecuted if enacted by a single sovereign." *Denezpi*, 596 U.S. at 597-98.

The Indictment here does not violate double jeopardy principles. First, impeachment threatens only "removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States," U.S. Const. art. I, § 3, cl. 7, neither of which is a criminal penalty. *See supra* at 9. Nor does Defendant argue that they are civil penalties that should be construed as criminal penalties. *See* Constitutional Motion at 23-24. Second, the impeachment proceedings charged Defendant with "Incitement of Insurrection," which is not charged in the Indictment. *See* Opp'n to Constitutional Motion at 60-62 (citing H.R. Res. 24, 117th Cong. (Jan. 11, 2021)). Although there are few decisions interpreting the analogous federal statute that prohibits inciting "any . . . insurrection against the authority of the United States or the laws thereof," 18 U.S.C. § 2383, it is well-established that "incitement" typically means "advocacy . . . directed to inciting or producing imminent lawless action" that is "likely to

incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). None of the statutes under which Defendant is charged require the Government to prove incitement. *See* 18 U.S.C. § 371; *id.* §§ 1512(c)(2), (k); *id.* § 241; *accord* Indictment ¶¶ 6, 126, 128, 130. The impeachment proceedings and this prosecution therefore did not "twice put" Defendant "in jeopardy of life or limb" for the "same offense."

Defendant also contends his prosecution violates double jeopardy principles because the distinct branches of government are part of one single sovereign. Constitutional Motion at 24. But even assuming that is true, Defendant does not argue that impeachment carries a criminal sanction or that the impeachment proceedings were based on the same offense as charged in the Indictment. *See id.* at 23-24. Instead, he argues that different double jeopardy principles would apply to prosecutions following impeachments, referencing only the Impeachment Judgment Clause for support. Constitutional Reply at 18-20. But, as discussed below, the Impeachment Judgment Clause provides only that prosecutions following convictions at impeachment are constitutionally permissible; it does not create special double jeopardy principles. *See* U.S. Const. art. I, § 3, cl. 7; *infra* Section V.B. Consequently, the Indictment does not violate the Double Jeopardy Clause.

## B. Impeachment Judgment Clause

The Impeachment Judgment Clause provides that "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial,

Judgment and Punishment, according to Law." U.S. Const. art. I, § 3, cl. 7. As explained above, the first part of the Clause limits the remedies available in impeachment, and the second part provides that even if a person is convicted in impeachment proceedings, they may still be subject to criminal prosecution. *See supra* at 8-10. As the Office of Legal Counsel noted, the "second part makes clear that the restriction on sanctions in the first part was not a prohibition on further punishments; rather, those punishments would still be available but simply not to the legislature." OLC Double Jeopardy Memo at *10.

Defendant contends the Impeachment Judgment Clause contains a negative implication: if a person is *not* convicted in impeachment proceedings, they may *not* be prosecuted. Constitutional Motion at 18-23; Constitutional Reply at 10-11. In statutory interpretation, the *expressio unius* canon, which provides that "expressing one item of an associated group or series excludes another left unmentioned," does not apply unless "circumstances support a sensible inference that the term left out must have been meant to be excluded." *NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017) (citations omitted). Because Defendant's reading is not supported by the structure of the Constitution, the historical context of the impeachment clauses, or prior constitutional precedents, *expressio unius* does not apply. *Accord Thompson v. Trump*, 590 F. Supp. 3d 46, 86-87 (D.D.C. 2022). The Impeachment Judgment Clause does not provide that acquittal by the Senate during impeachment proceedings shields a President from criminal prosecution after he leaves office.

1. Structure

Structural considerations support reading the Impeachment Judgment Clause as the plain language suggests. First, as the Government notes, impeachment and prosecution serve distinct goals within the separation of powers. *See* Opp'n to Constitutional Motion at 52-53. Impeachment "is designed to enable Congress to protect the nation against officers who have demonstrated that they are unfit to carry out important public responsibilities," whereas prosecution is designed to "penalize individuals for their criminal misdeeds." OLC Double Jeopardy Memo at *13. Impeachment proceedings provide far fewer procedural safeguards than do prosecutions, *see id.*, and accordingly, Congress may not dispense criminal penalties in impeachment proceedings, *supra* Section V.A. Impeachment is not a substitute for prosecution.

Second, the Senate may acquit in impeachment proceedings even when it finds that an official committed the acts alleged. For example, the Senate may acquit because it believes the acts committed do not amount to "high Crimes and Misdemeanors," U.S. Const. art. II, § 4; because the Senate believes it lacks authority to try the official; or for partisan reasons. OLC Double Jeopardy Memo at *14-15. Indeed, the Framers anticipated that impeachments might spark partisan division. *See* The Federalist No. 65, at 330-31 (Alexander Hamilton); Letter from Edmund Pendleton to James Madison, Oct. 8, 1787, 10 *The Documentary History of the Ratification of the Constitution* 1773 (1976); 10 *The Papers of James Madison* 223 (Rutland et al. ed., 1977); *accord* OLC Double Jeopardy Memo at *15. Acquittal on impeachment does not establish the defendant's innocence.

Defendant contends that impeachment serves to protect officials from political attacks by their enemies, and allowing prosecution following impeachment acquittal would undermine that protection. Constitutional Reply at 15-18. But politics are likely to play even larger a role in impeachments than in prosecutions, given that impeachments are conducted by elected officials politically accountable to their constituents, whereas prosecutions are conducted by appointed officials, most of whom may not be removed without cause, *see Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492-93 (2010) (explaining for-cause removal). And former officials like Defendant, rather than current officials, are also less likely to be politically attacked, because they no longer hold the power and authority of political office.

2. <u>Historical context</u>

Defendant claims that his interpretation of the Impeachment Judgment Clause reflects the original public meaning of the impeachment clauses. Constitutional Motion at 20-21; Constitutional Reply at 12-15. Considerable historical research undermines that contention. *See* OLC Double Jeopardy Memo at *7-12 ("We are unaware of any evidence suggesting that the framers and ratifiers of the Constitution chose the phrase 'the party convicted' with a negative implication in mind."); *accord Thompson*, 590 F. Supp. 3d at 87. Most notably, the Founders repeatedly acknowledged that impeachment acquittals would not bar subsequent prosecutions. For example, James Wilson, who participated in the Constitutional Convention, observed that officials who "may not be convicted on impeachment . . . may be tried by their country." 2 *The Documen-*

*tary History of the Ratification of the Constitution* 492. Edward Pendleton, who was President of the Virginia Ratifying Convention, similarly observed that "an Acquital would not bar," a "resort to the Courts of Justice," Letter from Edmund Pendleton to James Madison, Oct. 8, 1787, 10 *The Documentary History of the Ratification of the Constitution* 1773, a conclusion that James Madison called "extremely well founded," 10 *The Papers of James Madison* 223. Justice Story too described that, following impeachment, "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 *Story's Commentaries* § 780.

Founding-era officials similarly acknowledged that an acquittal at impeachment proceedings would not bar a subsequent prosecution. For example, during the first federal impeachment trial, Representative Samuel Dana contrasted impeachment proceedings with criminal trials, stating that impeachment had "no conne[ct]ion with punishment or crime, as, whether a person tried under an impeachment be found guilty or acquitted, he is still liable to a prosecution at common law." 9 *Annals of Congress* 2475 (1798). None of the sources Defendant cites refute that conclusion. *See* Constitutional Motion at 20-21.

3. Prior precedent

Defendant's additional arguments invoking past constitutional precedents are similarly unavailing. He first cites Justice Alito's dissent in *Vance*. Constitutional Motion at 19-20. In *Vance*, the Supreme Court held that a sitting President is not immune from state criminal subpoenas, nor does a heightened standard apply to such requests. 140 S. Ct. at 2431. In so holding, the

majority opinion reiterated that "no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding." *Id.* Justice Alito's dissent, moreover, noted that under the Impeachment Judgement Clause, "criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Id.* at 2444 (Alito, J., dissenting); *see* Constitutional Motion at 19. All Justice Alito's dissent observed is that, temporally, any prosecution must follow the judgment on impeachment; no official shall be subject to simultaneous impeachment proceedings and criminal prosecution. The dissent does not support the view that if impeachment proceedings end in acquittal, subsequent prosecution violates double jeopardy.

Defendant also cites *Fitzgerald* for the proposition that the threat of impeachment alone is the proper remedy against a President for any "official misfeasance." Constitutional Motion at 22. But as already explained, *Fitzgerald* is meaningfully distinguishable; it addressed immunity from civil suit, and all nine Justices took care to emphasize that their reasoning did not extend to the criminal context. *See supra* Section III.B.1.

In sum, neither the Double Jeopardy Clause nor the Impeachment Judgment Clause prevent Defendant, who while President was acquitted in impeachment proceedings for incitement, from being prosecuted after leaving office for different offenses.

## VI.   DUE PROCESS

Finally, Defendant contends that the Indictment violates the Due Process Clause because he lacked fair no-

tice that his conduct was unlawful. Constitutional Motion at 25-31.

## A. Due process principles

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To comply with due process, a law must give "fair warning" of the prohibited conduct. *United States v. Lanier*, 520 U.S. 259, 265 (1997) (citation omitted). A law fails to give fair warning if the text of a statute is so unclear that it requires the Judicial and Executive Branches to "define what conduct is sanctionable and what is not," *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *see Lanier*, 520 U.S. at 266 (citation omitted), or a judge construes the statute in a manner that is "clearly at variance with the statutory language," *Bouie v. City of Columbia*, 378 U.S. 347, 356 (1964); *see Rogers v. Tennessee*, 532 U.S. 451, 457 (2001); *see also Lanier*, 520 U.S. at 266.

For instance, in 2015, the Supreme Court concluded that the residual clause of the Armed Career Criminal Act violated due process because it was so vague—and difficult to administer—that defendants lacked notice of how it would be applied in any given case. *Johnson v. United States*, 576 U.S. 591, 597 (2015). The Court explained that the residual clause required judges to imagine an "ordinary case" involving the crime with which the defendant was charged, and compare the defendant's actions to that "ordinary case." *Id.* at 597, 599. It further emphasized that its "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm[ed] its hopeless indeterminacy," *id.* at 598, noting that the clause

had caused "numerous splits among the lower federal courts," *id.* at 601 (citation omitted).

A statute does not fail to give fair warning just "because it 'does not mean the same thing to all people, all the time, everywhere.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation omitted). "Since words, by their nature, are imprecise instruments," laws "may have gray areas at the margins" without violating due process. *United States v. Barnes*, 295 F.3d 1354, 1366 (D.C. Cir. 2002). Indeed, statutes are rarely found unconstitutional because their text fails to give fair warning. *See, e.g.*, *Bronstein*, 849 F.3d at 1107 (statute upheld); *Barnes*, 259 F.3d at 1366 (same); *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303-05 (D.C. Cir. 2023) (same); *Kincaid v. Gov't of D.C.*, 854 F.3d 721, 728-30 (D.C. Cir. 2017) (same); *Agnew v. Gov't of D.C.*, 920 F.3d 49, 55-61 (D.C. Cir. 2019) (same).

Applying a novel judicial construction of a statute may also fail to give fair warning if it "unexpectedly broadens" the statute's reach and applies that expanded reach "retroactively." *Bouie*, 378 U.S. at 353-57; *see Rogers*, 532 U.S. at 457; *Reed v. Goertz*, 143 S. Ct. 955, 960-61 (2023). In *Bouie*, for example, defendants were convicted of violating a state law prohibiting "entry upon the lands of another . . . after notice from the other . . . prohibiting such entry" after they remained on premises after being asked to leave, even though they did not re-enter the premises. 378 U.S. at 355. The Supreme Court held that the state supreme court's construction of the statute failed to give the defendants fair notice because it was "clearly at variance

with the statutory language" and had "not the slightest support in prior [state] decisions." *Id.* at 356.

## B. **The Indictment does not violate due process**

Defendant had fair notice that his conduct might be unlawful. None of the criminal laws he is accused of violating—18 U.S.C. § 371; *id.* § 1512(k); *id.* § 1512(c)(2); and *id.* § 241—require the Executive or Judicial Branch to "guess" at the prohibited conduct, *Lanier*, 520 U.S. at 266. Nor does finding that the Indictment complies with due process require the court to create a novel judicial construction of any statute.

Defendant notes that the "principle of fair notice has special force" in the First Amendment Context. Constitutional Motion at 26-27. While that may be true, even "special force" does not place Defendant's alleged conduct "outside the plain language of the charged statutes" as he alleges. *See id.* at 27. First, his argument does not contrast the allegations in the Indictment with the plain language of the statutes, but instead attempts to recast the factual allegations in the Indictment itself as no more than routine efforts to challenge an election. *See id.* at 31 (claiming that "post-election challenges" like Defendant's "had been performed in 1800, 1824, 1876, and 1960 . . . without any suggestion [it was] criminal"). But again, at this stage, the court must take the allegations in the Indictment as true. *Supra* Section II, IV.B.3. The fact that Defendant disputes the allegations in the Indictment do not render them unconstitutional. Second, the meaning of statutory terms "need not be immediately obvious to an average person; indeed, 'even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some stat-

utes may compel or forbid.'" *Agnew*, 920 F.3d at 57 (citation omitted). And due process does not entitle Defendant to advance warning that his precise conduct is unlawful, so long as the law plainly forbids it. *See Lanier*, 520 U.S. at 271; *cf. United States v. Int'l Mins. & Chem. Corp.*, 402 U.S. 558, 563 (1971) ("ignorance of the law is no defense").

Defendant also claims he lacked fair notice because there is a "long history" of government officials "publicly claiming that election results were tainted by fraud" or questioning election results, yet he is "the first person to face criminal charges for such core political behavior." Constitutional Motion at 25; *see id.* at 27-30. But there is also a long history of prosecutions for interfering with the outcome of elections; that history provided Defendant with notice that his conduct could be prosecuted. *See* Opp'n to Constitutional Motion at 39-40 (citing six examples of 18 U.S.C. § 241 prosecutions). Indeed, the Supreme Court has addressed more than one case in which officials were prosecuted for interfering with or discarding election ballots. *United States v. Mosley*, 238 U.S. 383, 385 (1915); *United States v. Saylor*, 322 U.S. 385, 386 (1944).

In addition, none of the contested elections Defendant invokes is analogous to this case. *See* Opp'n to Constitutional Motion at 40-47 (detailing the history of each election). As noted above, Defendant is not being prosecuted for publicly contesting the results of the election; he is being prosecuted for knowingly making false statements in furtherance of a criminal conspiracy and for obstruction of election certification proceedings. And in none of these earlier circumstances was there any allegation that any official engaged in criminal conduct to

obstruct the electoral process. For instance, following the 2004 Presidential election, Representative Stephanie Tubbs Jones raised an objection to Ohio's electoral votes at the joint session; Senator Boxer signed the objection. 151 Cong. Rec. 199 (Jan. 6, 2005). As Representative Jones explained in a separate session, that objection was to allow "a necessary, timely, and appropriate opportunity to review and remedy . . . the right to vote." *Id.* Ohio's electoral votes were then counted for President Bush. Defendant points to no allegation that Representative Jones' objection was in furtherance of a criminal conspiracy or designed to obstruct the electoral process.

Moreover, even if there were an analogous circumstance in which an official had escaped prosecution, the mere absence of prior prosecution in a similar circumstance would not necessarily mean that Defendant's conduct was lawful or that his prosecution lacks due process. The "exclusive authority and absolute discretion to decide whether to prosecute a case"—within bounds, *supra* at 19-20—is a cornerstone of the Executive Branch. *Nixon*, 418 U.S. at 693 (citation omitted).

Finally, Defendant argues that, for the Indictment to comply with due process, the prosecution bears the burden to "provide examples where similar conduct was found criminal." Constitutional Reply at 21. Under that theory, novel criminal acts would never be prosecuted. The Constitution does not so constrain the Executive Branch.

## VII. CONCLUSION

For the foregoing reasons, the court will DENY Defendant's Motion to Dismiss Indictment Based on Presidential Immunity, ECF No. 74, and Motion to Dismiss

the Indictment Based on Constitutional Grounds, ECF No. 113. A corresponding Order will accompany this Memorandum Opinion.

Date: Dec. 1, 2023

/s/ <u>TANYA S. CHUTKAN</u>
TANYA S. CHUTKAN
United States District Judge

## APPENDIX B

1.  U.S. Const. Amend. V provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

2.  U.S. Const. Art. I, § 3, Cl. 7 provides:

Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States:  but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

3.  U.S. Const. Art. II, § 1, Cl. 1 provides:

The executive Power shall be vested in a President of the United States of America.  He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows.

# EXHIBIT 3

No. 22-BG-891

# DISTRICT OF COLUMBIA COURT OF APPEALS



Clerk of the Court
Received 10/13/2023 04:28 PM

In the Matter of:

Jeffrey B. Clark, Esq.
*Respondent*,

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar No. 455315)
Board Docket No. 22-BD-039

## DISCIPLINARY COUNSEL'S RESPONSE
## TO CLARK'S EMERGENCY SUPPLEMENT

This matter arises from a disciplinary proceeding against Jeffrey Clark which is pending before a hearing committee of the Board on Professional Responsibility. The only aspect of that proceeding before this Court is Disciplinary Counsel's motion to enforce a subpoena.

Clark filed notices purporting to remove both the hearing committee proceeding and the subpoena-enforcement matter to federal court. On January 17, 2023, this Court determined to hold the subpoena-enforcement matter in abeyance until the removal was resolved by the federal court.

On June 8, 2023, the district court granted Disciplinary Counsel's motions to remand this matter and the underlying disciplinary proceeding. *In re Clark*, No. 1:22-mc-96 (D. D.C. Jun. 8, 2023). Clark filed an appeal and asked this Court

1

continue to hold the subpoena-enforcement matter in abeyance "and/or" to order that proceedings before the hearing committee be deferred while he appealed the remand in federal court. Disciplinary Counsel opposed, noting that Clark was effectively asking this Court for a stay pending his appeal in a different court, and arguing that Clark had not met the traditional factors for a stay pending appeal.

Clark now requests "emergency action" on his motion. The emergency he claims is a prehearing conference in the disciplinary matter scheduled for October 18, 2023. His pleading does not mention the subpoena-enforcement matter pending before this Court at all.

## ARGUMENT

Clark's apparent strategy is to simultaneously pursue every argument he can think of in every forum he can think of without regard to the posture of the matter in that forum or whether it is necessary or prudent for that forum to act. He seems to think that "everything, everywhere, all at once" creates a compelling reason to grant relief, as he consistently takes pains to list all of his pending motions and attach hundreds of pages to his pleadings, as if volume is inherently a virtue. In his most recent pleading before this Court, for example, he points out that he has not one but two motions for a stay pending before the D.C. Circuit and that he has requested the same relief he seeks from this Court in this subpoena-enforcement matter—halting

the hearing committee proceedings—from the Board and the hearing committee itself. He attaches to the pleading 947 pages of "exhibits."

The Court should not indulge him. The matter before this Court involves the enforcement of a subpoena. A prehearing conference in the disciplinary matter does not create any emergency here. Indeed, it does not create an emergency at all. At most, the prehearing will result in a list of dates and deadlines several months into the future. Further, there is a process to request deferral based on a parallel criminal proceeding, which Clark has invoked by asking the hearing committee to recommend that the proceedings be deferred. *See* Board Rules 4.1 & 4.2. Clark offers no reason the Court should disrupt the ordinary course of that request on an emergency basis.

Moreover, the only substantive argument in Clark's pleading is plainly incorrect. He claims that a stay of the disciplinary proceeding is required by a recent Supreme Court case, *Coinbase, Inc. v. Bielski*, 143 S.Ct. 1915 (2023). He is wrong. *Coinbase* involved whether a district court must stay proceedings while an interlocutory appeal on the issue of arbitrability is pending. The Court held that a stay is required during an interlocutory appeal authorized under Section 16(a) of the Federal Arbitration Act. That holding does not remotely apply here. Otherwise, Clark purports to incorporate the arguments he has presented to the hearing committee. But

again, he offers no reason why this Court should override the established process for consideration of those arguments.

## CONCLUSION

Clark's motion should be denied.

Respectfully submitted,

HAMILTON P. FOX, III
  *Disciplinary Counsel*

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER
  *Senior Assistant Disciplinary Counsel*

JASON HORRELL
  *Assistant Disciplinary Counsel*

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

**CERTIFICATE OF SERVICE**

I certify that on October 13, 2023, I served the foregoing through the Court's

electronic filing system on the following:

Charles Burnham, counsel for Respondent, charles@burnhamgorokhov.com

<div style="margin-left:40%">

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER
OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

</div>